**UNITED STATES of America,
Plaintiff,**

**v.**

**STANDARD OIL COMPANY OF CALIFORNIA, The Texas Company, Bahrein Petroleum Company, Ltd., California-Texas Oil Company, Ltd., Caltex Oceanic, Ltd., and Mideast Crude Sales Company, Defendants.**

United States District Court
S. D. New York.
July 17, 1957.

Herbert Brownell, Jr., Atty. Gen., by Milo V. Olson, Sp. Asst. to Atty. Gen., and John Tretheway and Morton Nam-row, Trial Attorneys, Department of Justice, Washington, D. C., for the U. S.

Cahill, Gordon, Reindel & Ohl, New York City, John T. Cahill, Milton R. Wessel, and William J. Quinlan, New York City, David R. Hyde, New York City, of counsel, for defendant Standard Oil Co. of California.

Webster, Sheffield & Chrystie, New York City, and Bethuel M. Webster, Frederick P. Haas, Oscar John Dorwin, Robert G. Sprague, Edward L. Rea, Donald J. Cohn, New York City, of counsel, for defendant Texas Co.

Proskauer, Rose, Goetz & Mendelsohn, New York City, Joseph M. Proskauer, George M. Shapiro and Albert E. Van-Dusen, New York City, Marvin E. Frankel, Washington, D. C., Julius J. Teller, New York City, Norman P. Schoenfeld, New York City, of counsel, for defendants Bahrein Petroleum Co., Ltd., California-Texas Oil Co., Ltd., Caltex Oceanic, Ltd., and Mid-East Crude Sales Co.

THOMAS F. MURPHY,[*] District Judge.

By this action the Government seeks recovery of some sixty-six million dollars, the amount the Economic Cooperation Administration (ECA) and its successor, the Mutual Security Agency (MSA) expended to finance European purchases of Saudi Arabian crude oil supplied by two of the defendants during the period September 1, 1950 to August 31, 1952.

### Introduction

A better understanding of this claim requires some brief background on a number of subjects. By way of introduction, we will discuss in a general fashion the European Recovery Program (ERP), the ECA statutory and regulatory scheme, the history of the lawsuit, the present complaint, defendants' corporate relationships and Middle Eastern operations, the world crude oil pricing structure, and plaintiff's various theories.

After World War II it became evident to those in authority that if Europe were to recover from the ravages of war the

United States would have to take the laboring oar. In June 1947 General Marshall, then Secretary of State, announced that the time had come for the European countries to cooperate with each other to resist the advance of Communism and the corrosion and destruction of the world. If they did so, he said, their efforts would be echoed on our part by moral and financial assistance. Almost immediately the leaders of the European countries answered the cue and the Organization of European Economic Cooperation (OEEC) was formed for the purpose of supplying the European participating countries with the sinews of recovery, largely in the form of materials. It was a program, at great expense to the American taxpayer, to aid in the establishment of a so-called lasting peace. (Parenthetically, it should be noted that the Soviet Union opposed the plan of European recovery and refused not only to participate itself, but prevented its satellites from so doing.)

At that time there was a tremendous dollar gap in the fiscs of Europe, and in order to buy materials in the world market United States dollars were sorely needed. To remedy this, the United States enacted the Foreign Assistance Act of 1948, 22 U.S.C.A. §§ 1404, 1409, 1410, 1503 et seq., 1651 et seq., 62 Stat. 137, and the Economic Cooperation Administration Act, 22 U.S.C.A. §§ 1503 et seq., 1651 et seq., 62 Stat. 137. Congress said that its purpose was to "promote the general welfare and national interest of the United States by furnishing material and financial assistance to European countries; to develop the military strength of those countries; to promote their industrial and agricultural production; and to facilitate and stimulate the growth of international trade thereby achieving for those countries healthy economies, restoration of individual liberties, and genuine independence".

Under ECA/MSA United States dollars were allocated to the various European nations participating in the foreign aid program by the issuance of "Procurement Authorizations" which set forth the conditions for the procurement of commodities. Firms in participating countries which desired crude oil and other commodities, after obtaining the approval of their respective governments, contracted to purchase those commodities from various suppliers. Such purchasers made payment to their local governments in local currencies, and the money so paid was placed in a "counterpart fund" account for use locally in connection with the foreign aid program. Suppliers of crude oil were paid, on presentation of Supplier's Certificates, in United States currency by ECA/MSA out of appropriated funds, either through the participating countries or through designated banks in accordance with the Procurement Authorizations.

So large scale an expenditure of United States dollars evoked concern on the part of Congress respecting the prices at which ECA should properly finance purchases so as to ensure the most advantageous use of its funds. However, the only statutory provision in the various Acts is the following:

> "No funds authorized for the purposes of this Act shall be used for the purchase in bulk of any commodities at prices higher than the market price prevailing in the United States at the time of the purchase, adjusted for differences in the cost of transportation to destination, quality, and terms of payment."

This section, 202 of the Foreign Aid Appropriation Act, 1949, 62 Stat. 1059, became sec. 112(l) of the Economic Cooperation Act, by virtue of an amendment in 1949, 63 Stat. 53, 22 U.S.C.A. § 1510 (l). At first blush, such provision seems somewhat inadequate for an agency which was to disburse such huge sums of the taxpayers' money. But on closer analysis the reasons for such a general provision become clear. ECA was neither a procurement agency nor a price-fixing agency. Its role was that of an investment banker. All purchases were to be made through ordinary business channels by the individual buyers and sellers

with ECA only supplying the dollars to the seller after the buyer had deposited an equal amount of his own currency with his own government. Thus, for policing purposes, ECA relied primarily on the buyer's own self-interest in acquiring his goods as cheaply as possible. It did, however, retain the right to post audit each transaction and to demand reimbursement, in whole or in part, from the buyer's government for any purchases which exceeded the maximum prices.

The ECA Administrator, by statute, was given the authority to promulgate regulations. This he did. The initial regulations restated the statutory test for maximum prices and required a Supplier's Certificate to be signed and filed by each supplier in which he certified, among other things, that upon information and belief and upon such information as was available to him the prices charged were not in excess of the statutory maximum. The supplier also agreed to reimburse the Administrator for any breach of the terms of the Certificate.

This Regulation 1 was amended on May 3, 1949. The statutory maximum price test was again repeated and further language was added to the effect that within that limitation it was ECA's policy to finance only such purchases as were made at prices "that approximate as nearly as practicable, lowest competitive market prices." It also expressed the hope that buyers would agree to pay no more than such prices, and stated that its rules were intended as a guide to buyers and sellers. Then followed the sentence "These rules fix the point beyond which purchases will not be eligible for reimbursement by ECA." (In November 1949 this sentence was amended to read "The rules in this part fix the point beyond which purchases will not be eligible for reimbursement by ECA"). The regulations further provided that ECA would take appropriate action to impose additional limitations if it appeared that the objective of lowest competitive market prices was not being met. This was followed by definitions of various terms,

not including lowest competitive market price, and a number of more specific price provisions concerning three classes of commodities not here pertinent. But Class IV stated that the Administrator might from time to time establish special rules for certain unspecified commodities. Lastly there appeared another wholly new price provision which we shall refer to as the comparable sales test. This provided that a price would be approved by ECA if (1) it did not exceed any price charged by the supplier in a comparable sale (individual supplier test), (2) it did not exceed the export market price prevailing in comparable sales by the principal suppliers in the source country (principal supplier test), and (3) it did not exceed the statutory test. The Supplier's Certificate was accordingly amended to include a certification that the price charged was no higher than that calculated in accordance with the applicable price provisions of Regulation 1.

### The Three Complaints

With this background we can now turn to a brief history of the lawsuit. The original complaint, filed August 22, 1952, alleged that Bahrein Petroleum Company Limited (Bahrein), California Texas Oil Company, Limited (Caltex), Caltex Oceanic Limited (Oceanic), and Mid-East Crude Sales Company (Mid-East) acted as the *alter egos* of Standard Oil Company of California (Socal) and The Texas Company (Texas); set forth the statutory and comparable sales tests; and alleged violations of these in that the prices charged were in excess of (a) the prevailing market price in the United States, (b) the prices charged by defendants in comparable export sales, and (c) the export market price prevailing in the Middle East. Damages, equalling the amount of overcharges, were demanded from May 3, 1949. A second count alleged that defendants had promised to sell ECA financed oil at a price which did not exceed any price f. o. b. the Middle East but that they had in fact charged lower prices in other non-ECA financed transactions. The third count made sub-

stantially similar allegations and alleged payment by mistake.

Such complaint was amended December 22, 1952. The first count demanded damages for overcharges against Oceanic and Mid-East only based on a violation of each of the three sections of the comparable sales test, alleging that on the basis of information available to them they knew the prices charged exceed the maximum and that consequently the Supplier's Certificate was false. Counts two, three, and four alleged a violation of the statutory test, breach of an agreement not to charge prices on ECA financed transactions higher than those charged on other sales, and payment by mistake. Each was directed only toward Oceanic and Mid-East. The fifth through the eighth counts made the same allegations as the first four counts, but asserted them against all the remaining defendants on the *alter ego* theory. The "show cause" letter to Caltex of January 18, 1951 and the March conference which followed it make it clear that the gravamen of the complaint was violation of the first two sections of the comparable sales test resulting from transfers by the producer of the crude oil to the parents of Caltex, which were also parents of the producer, at an artificially determined price lower than ECA financed, which was alleged to be the export market price. This theory has now been abandoned.

The Second Amended Complaint was filed March 16, 1956. It disavowed any claim for violation of the statutory test, repudiated any allegations of fraud or deceit, and sought damages only from September 1, 1950. The first count, after detailing most of plaintiff's evidence, alleges that ECA regulations required defendants to sell at "prices that approximated as nearly as practicable, lowest competitive market prices," and that since defendants had not done so their transactions were not eligible for ECA financing and ECA was entitled to recover the full amount paid. Count three alleges an agreement between plaintiff and defendants not to charge prices in excess of lowest competitive market prices and breach of that agreement. Count four alleges violations of the first two provisions of the comparable sales test. The remaining counts relate to alternative theories respecting the amount of damages. This complaint contains no allegation of the *alter ego* theory. It merely contains the sentence "Because of the aforesaid [stock] ownership all defendants will, for convenience, hereinafter be referred to as defendant."

### Defendants' Corporate Relationships

Since these corporate relationships assume considerable importance, we shall review them here briefly. Socal and Texas are Delaware corporations wholly independent of each other. Both are integrated oil companies, that is they are engaged in the discovery, production, transportation, refining and marketing of crude oil and its related products. Both operate through the media of numerous subsidiaries. Bahrein is a Canadian corporation owning the concession on Bahrein Island in the Persian Gulf and engaged in refining crude oil. It is owned 50% by Socal and 50% by Texas. Caltex, a Bahamian corporation, is a service organization wholly owned by Bahrein. Oceanic is a Bahamian corporation engaged in selling crude oil and refined products (principally the latter) to European affiliates and subsidiaries of Caltex. Mid-East, also a Bahamian corporation, is engaged in selling crude oil to non-affiliates in Europe. Both Oceanic and Mid-East are owned 50% by Socal and 50% by Texas Petroleum Company (Texpet), a wholly owned subsidiary of Texas. The Arabian American Oil Company (Aramco), a Delaware corporation, owns and operates the concession in Saudi Arabia and is owned 30% each by Socal, Texas, and Standard Oil Company (N. J.) (Jersey), and 10% by Socony-Mobil Oil Company, Inc. (Socony). Trans-Arabian Pipeline Company (Tapline) owns and operates the pipeline between Ras Tanura, Saudi Arabia and Sidon, Lebanon, and is owned in the same manner as Aramco.

### Defendants' Middle Eastern Operations

Middle Eastern operations were carried on in roughly the following manner. Jersey, Socony, and Oceanic (on behalf of Socal and Texas) entered into an agreement with Aramco whereby the former, called offtakers, agreed to purchase, and Aramco to sell, crude oil. Each was to share in Aramco's total production according to its stockholding interest, i. e. Oceanic 60%, Jersey 30%, and Socony 10%. The offtake price, which during the period involved was $1.43 per barrel, was determined by an agreement among Aramco's parents. The crude oil was lifted either at Ras Tanura, or at Sidon after tapline came on stream. Each offtaker was free to dispose of its oil as it saw fit. From time to time Oceanic would nominate certain other corporations to offtake directly from Aramco a portion of its share. These corporations included Mid-East, Texas, Calmara Oil Company (Calmara) and California Transport Corporation (Cal Transport), the latter two being wholly owned subsidiaries of Socal. These assignee offtakers were billed directly by Aramco. After tapline was opened in December 1950 all Aramco billings for oil lifted at Sidon also included tapline costs. Aramco thus operated as a collecteor for Tapline and remitted the amounts so received to it.

During the period of this lawsuit the prices charged by Oceanic and Mid-East in all ECA financed transactions, as well as all non-ECA financed sales, were $1.75 per barrel f. o. b. Ras Tanura and $2.41 per barrel f. o. b. Sidon.

### World Crude Oil Price Structure

In order to properly appreciate plaintiff's theories respecting lowest competitive market prices, we turn now to a short history of the world crude oil price structure and description of the manner in which defendants at one time determined the f. o. b. price of their oil.

Prior to World War II the United States was the major exporter of crude oil, competing in all markets. The United States Gulf was virtually the only location from which importers could obtain supplies sufficient to cover any likely requirements. Importation from this source was the alternative to importation from any other source. Consequently, all crude oil was priced on the basis of U. S. Gulf posted prices plus freight from the Gulf to destination, regardless of where the oil actually originated. Thus the price of foreign source oil was competitive, on a delivered basis, with the landed price of U. S. Gulf oil at the same destination. This resulted in different netbacks to the foreign supplier depending upon the market to which he sold. A netback, about which much will be said later, is a figure obtained by deducting freight, insurance etc. from the laid down price. It is the amount realized by the exporter after deducting all costs save those of production.

After World War II when Middle Eastern oil came into full production, the U. S. Gulf ceased to be the major source of supply. Middle Eastern crude gradually took over the European market. This situation necessitated a corresponding change in the price structure. The first adjustment in Persian Gulf f. o. b. prices was the elimination of the varying netback. In other words, Middle Eastern producers set a flat price f. o. b. the Persian Gulf, and freight was based upon shipment from the Persian Gulf, not the U. S. Gulf, to the point of destination.

In determining what the proper price f. o. b. the Persian Gulf should be, Caltex decided to equate its oil to a comparable crude from Jusepin, Venezuela. It did so at a time when Western Hemisphere crude was still moving to Europe, although in diminishing amounts. The price of Jusepin crude was tied to U. S. Gulf prices since those two crudes were in direct competition. Caltex determined the laid down price of Jusepin crude at the ports of Northwestern Europe, deducted the freight from Ras Tanura to those same ports and fixed the resulting netback as its price f. o. b. Ras Tanura. This figure was $2.03 per barrel. However, that price was later

reduced to $1.75 per barrel to meet the competition of the Gulf Oil Company which cut the price of its Kuwait crude. Theoretically at least, during the entire period of this lawsuit the price f. o. b. Ras Tanura was $1.75 regardless of the destination to which the crude oil was shipped.

What, however, should the price structure be once Middle Eastern crude oil is not only sufficient to adequately supply the European market but begins to flow into the Western Hemisphere? That poses an extremely complex question and the parties are in violent disagreement. Defendants seem to argue that the Western Hemisphere and the Middle East would then become wholly independent areas of supply and an entirely new price structure would be necessary. Plaintiff argues that Middle Eastern prices in that event should be determined according to "the high and the low of the range" theory. This serves as the basis for what will be called plaintiff's formula. In essence it asserts that so long as Western Hemisphere oil flows to Europe Middle Eastern oil should be priced at a figure which just permits Western Hemisphere crude to compete in Europe—i. e. the posted price of Gulf or Venezuelan crude plus freight to Northwest Europe less freight from Northwest Europe to the Middle East. This was the basis on which the price of $2.03 per barrel was determined, and it is known as the high of the range. When, however, Middle Eastern oil flows regularly and in substantial volume to the Western Hemisphere, Middle Eastern crude should be priced at a figure which just permits it to compete on the East coast of the United States—i. e. the posted price of Gulf or Venezuelan crude plus freight to the Eastern seaboard of the United States less freight from the Eastern seaboard to the Middle East. This is the low of the range.

In order to call this formula into being, plaintiff must prove that the watershed is located in the Northeastern United States, instead of Northwestern Europe. By watershed is meant the area in which the two crudes compete. To prove this, plaintiff must show a net flow of oil (whether just crude or crude and petroleum products combined will be discussed later) to the Western Hemisphere. And to make this formula workable, some appropriate ocean freight factor must be established. This latter, a most complex matter, is discussed infra, 155 F.Supp. 145.

### Plaintiff's Theories

Plaintiff has tried its case on two broad theories—(1) lowest competitive market price, and (2) comparable sales. The formula just referred to forms the basis of the first theory. This theory in turn has three sub-parts. ECA is entitled to the lowest competitive market price determined by applying the formula on the grounds that there existed (a) a rule in Regulation 1 that required pricing at the low of the range to make the transaction eligible for ECA financing, (b) the Administrator was handling the crude oil situation on the basis of a Special Rule and that rule required pricing at the low of the range, or (c) there was an agreement between ECA and the defendants whereby the latter promised not to charge a price in excess of that calculated by the formula.

The second, or comparable sales theory, alleges that certain Western Hemisphere transactions of Socal and Texas were comparable sales at a price lower than that at which ECA was financing, hence ECA according to the regulations should have been given the benefit of the lower price.

Plaintiff alleges that the legal foundation for this lawsuit rests upon the Supplier's Certificate in which the supplier certified that the prices charged were calculated in accordance with the applicable price provisions of Regulation 1, and agreed to reimburse the Administrator for any breach of the Certificate.

Since it is undisputed that only two of these defendants, Oceanic and Mid-East, ever supplied crude oil or signed the Certificates, plaintiff alleged (at the trial but not in its complaint) a joint

venture to hold all defendants liable. While this theory of joint venture affects so much of the first cause of action as relates to Socal, Texas, Bahrein, and Caltex, it goes to the very essence of the comparable sales theory of recovery and will be discussed in detail at that point.

### ECA Regulations

The pertinent parts of ECA Regulation 1, as amended May 3, 1949, and published in the Federal Register, 14 F.R. 2166, are as follows:

"Subpart D—Price Provisions

"§ 201.21  *Purchase in bulk of commodities*—(a) *Definition.* The term 'adjusted market price' means the market price prevailing in the United States at the time of the purchase, adjusted for differences in the cost of transportation to destination, quality, and terms of payment, as determined by the Administrator.

"(b) *Scope.* This section establishes the procedures for compliance with section 112(*l*) of the act and section 202 of the Foreign Aid Appropriation Act, 1949, which sections apply to all purchases in bulk, except those where, before June 28, 1948, both (1) a binding purchase contract was in effect between the parties in which the price, or the method for determining the price, was established, and (2) the Procurement Authorization was issued. In such excepted cases, any statement in the Supplier's Certificate relating to the provisions of this section shall be deemed to be waived by ECA.

"(c) *Determination of adjusted market price.* Determination of the adjusted market price may be made by the Administrator in such manner as to reflect commonly accepted trade practices. In the case of purchases in bulk made outside the United States, the Administrator may determine that the purchase price complies with said sections 112(*l*) and 202 if he determines that such price, plus cost of transportation and related charges from place of purchase to the participating country at established rates, does not exceed the market price prevailing in the United States (adjusted for differences in quality and terms of payment), plus cost of transportation and related charges at established rates to the participating country. If the price of any purchase in bulk exceeds the adjusted market price, the participating country shall pay promptly to the Administrator upon demand the entire amount of the purchase price.

"§ 201.22  *Purchase prices*—(a) *Scope of this section.* (1) Section 112(*l*) of the act and section 202 of the Foreign Aid Appropriation Act of 1949 establish an upper limit to the prices that may be approved by ECA for purchases in bulk of commodities (see § 201.21). Within that limitation, it is the policy of ECA to make payment only for purchases of commodities, whether or not in bulk, which are made at prices that approximate, as nearly as practicable, lowest competitive market prices. It is expected that buyers, exercising prudence in their negotiations, will agree to pay no more than such prices.

"The rules set forth in this section are intended as a guide to buyers and sellers in conducting their negotiations. These rules fix the point beyond which purchases will not be eligible for reimbursement by ECA. Compliance with them will make a purchase eligible for financing, and post-audit will be made by ECA to determine whether there has been compliance. If it appears that the objective of lowest competitive market prices is not being met, ECA will take appropriate action to impose additional limitations.

"§ 201.22(e) (2) *Unlisted commodities.* A price for a purchase outside the United States of a commodity which is not listed in Class I above or subject to special rules under Class IV above will be approved for reimbursement if:

"(i) It does not exceed any price charged by the supplier at the time of purchase in a comparable export sale of the same or a similar commodity; and

"(ii) It does not exceed the export market price prevailing at the time of purchase in comparable sales of the same

or a similar commodity by the 'principal suppliers' in the source country, determined by applying to that country as nearly as may be, the rules set forth in paragraph (d) (2) of this section; and

"(iii) It results in a delivered cost to the port of entry in the participating country no higher than the delivered cost which would have been incurred in a purchase for export of the same or a similar commodity from one of the 'principal suppliers' in the United States.

"For the purposes of this subparagraph (2), a supplier shall be deemed a 'principal supplier,' if he is one of the group of the largest volume suppliers responsible for 50 percent of the export sales of the commodity from the United States, or source country, whichever is applicable."

### Summary of Plaintiff's Theories

The original theory of an actionable wrong advanced by the government was set forth in its "Show Cause Letter" to Caltex in January 1951, and in its first complaint filed August 22, 1952, viz., that the price which should have been charged, and that ECA should have financed, was the price of $1.43 a barrel f. o. b. Ras Tanura. This was the "offtake" price at which Aramco billed its stockholders or nominees when they lifted oil pursuant to offtake agreements. This theory, as indicated above, has been abandoned.

Plaintiff's present claim is based on a number of alternate theories: First: That there was a *rule* in the above quoted regulations which required that the prices eligible for ECA financing were only those that approximated as nearly as practicable the lowest competitive market prices. Second: If this was not a *rule* but merely an expression of ECA *policy* then, the government argues, there was a "Special Rule" adopted by the Administrator to the same effect, viz., that ECA was entitled to a price on crude oil that it financed that approximated as nearly as practicable the lowest competitive market price, and in either event such lowest competitive market price was determinable by a formula known as the "high and low of the range" which was a netback or realized price theory. Third: Defendants agreed with ECA to charge no more than a price determined by this formula. Such formula, which underlies all three alternatives, takes into consideration the flow of oil between the two hemispheres, assumes that the watershed of competition is the Eastern seaboard of the United States and that tanker rates are determinable and well-known. For the time being we shall lay aside these latter considerations and enquire solely whether or not there is any basis for the formula. As an alternate theory plaintiff secondarily relies on the comparable sales provisions of Regulation 1, viz., that application of this test shows that the prices financed by ECA were not eligible since Texas and Socal in a great many commercial transactions sold Arabian crude in this country and Canada at prices that were much less than the prices ECA was financing at the same time.

Under all theories it is plaintiff's position that the Ras Tanura price it was financing should have been $1.43 and the Sidon price it was financing should have been $1.66.

### Was Lowest Competitive Market Price a Price Fixing Rule?

Assuming that there was a joint venture and all defendants may be treated as one, an assay will be made of the various theories upon which plaintiff relies. In order that the aforementioned formula apply, there must be some authority for it in the Statute, the Regulations, a Special Rule, or an agreement with the defendants. The Government concedes that the formula does not exist in the Statute, and that it was not explicitly written into Regulation 1. Defendants deny that there was any such rule, "Special Rule", agreement or formula but, claim nevertheless, that the prices charged were in fact the lowest competitive market prices, inasmuch as no one in Europe could buy crude oil for less than they sold it.

We shall concern ourselves with three issues. One—Does the language relating to lowest competitive market price in § 201.22(a) (1) constitute a rule requiring defendants to price their oil according to the formula at the low of the range, or was it only a statement of general policy? Two—Did ECA adopt a Special Rule pursuant to § 201.22(d) (4) which required the use of such a formula? Three—Did the defendants agree with ECA not to charge a price in excess of that calculated in accordance with the formula?

Prior to May 3, 1949, Regulation 1 contained (insofar as prices are concerned) only the Statutory Test for maximum price. In May 1949, Regulation 1 was amended and for the first time contained the phrase "lowest competitive market price" in subparagraph § 201.22(a) (1) and the comparable sales provisions, (§ 201.22(e) (2)). Section 201.22, quoted above, sets forth in its first sentence the statutory maximum price by making reference to the enabling statutes and by giving notice that that statutory test establishes the upper limit to the prices that may be approved. Next comes the questioned phrase, "within that limitation it is the policy of ECA to make payment only for purchases of commodities * * * which are made at prices that approximate as nearly as practicable lowest competitive market prices." The last sentence expresses the hope that buyers will comply with that policy for it states, "It is expected that *buyers*, exercising prudence in their negotiations, will agree to *pay* no more than such prices." Note that there is no corresponding admonition that sellers should not charge more. This is in line with ECA's policy of not interfering directly in negotiations between buyers and sellers since it was neither a procurement nor a purchasing agency.

This paragraph is then immediately followed by a paragraph that reads, "The rules set forth in this section are intended as a guide to buyers and sellers in conducting their negotiations. The rules in this part fix the point beyond which purchases will not be eligible for reimbursement by ECA." (Before an amendment in November 1949 this sentence read, "These rules fix the point beyond which purchases will not be eligible for reimbursement by ECA"). "Compliance with them will make a purchase eligible for financing, and post audit will be made by ECA to determine whether there has been compliance. If it appears that the objective of lowest competitive market prices is not being met, ECA will take appropriate action to impose additional limitations."

The argument in support of plaintiff's theory that the above two paragraphs establish a price fixing *rule* runs like this, and we quote from its brief:

"Plaintiff's position is that the provision contained in Section 201.-22 of Regulation 1 that 'it is the policy of ECA to make payment only for purchases of commodities [such as crude oil] which are made at prices that approximate, as nearly as practicable, lowest competitive market prices' is a rule of Regulation 1, because it is contained under Subpart D, which subpart is entitled 'Price Provisions' and said Subpart D is a portion of Part 201, and, therefore falls within the description of 'The rules in this part fix the point beyond which purchases will not be eligible for reimbursement by ECA'."

This as a tortuous construction of a plain and unambiguous sentence. In clear, concise language the regulation states, "It is the *policy* * * *." If this sentence needed any explanation the next paragraph supplies it because there the Administrator uses the word "rules" when he is speaking about "rules" and the word "objective" when he is speaking about policy. By no gymnastics in construction or semantics can such a clear unambiguous sentence be construed as a price fixing *rule* unless we abandon completely the ordinary meaning of words. In addition, ECA's own Associate General Counsel at a conference with some of the defendants' representatives in

March 1951, when referring to such sentence, stated "That is the statement of general policy which is more or less introductory to the specific rules."

ECA's "Manual of Operations" on the subject of "Pricing Policies and Controls" is a most enlightening document deserving of great weight. Section II is entitled "Legislative and Administrative Basis of ECA Price Policy." Subdivision A restates the statutory test. Subdivision B sets forth ECA's policy with respect to lowest competitive market prices in language almost identical to that contained in § 201.22(a) (1) of the Regulations. It concludes with the statement that "To aid in carrying out this *policy*, ECA has adopted certain *rules* which are incorporated in ECA Regulation 1. These rules, generally stated, are: * * *." Then follow five rules, the first four of which are not here pertinent, and the fifth simply restates the statutory test. Section III is entitled "Price Analyses and Standards—Responsibilities of Suppliers and Importers." The first paragraph is significant. "ECA's system for determining acceptable prices *requires importers to buy* at the lowest possible price without benefit of having ECA pre-determine specific acceptable prices. This is in keeping with ECA's policy of maintaining normal private trade relationships, whereby buyers and sellers negotiate prices and terms in accordance with customary trade practices." Subdivision A relates to "Supplier's Responsibility—Price Certification." This deals with the Supplier's Certificate which "attests to the fact that: 1. The purchase price meets the provisions of Section 201.22 of ECA Regulation 1, as amended, which among other things, requires * * *." The first requirement is that the price charged be no higher than that charged by the supplier to customers similarly situated; the second, third and fourth pertain to discounts, "kickbacks" and cost-plus contracts; the fifth is the supplier's agreement to reimburse ECA for any breach of the certificate. The balance of the Manual relates to internal ECA

procedure. Nowhere in this official handbook on pricing policies and controls is there the faintest suggestion of any rule embodying plaintiff's formula. If such a rule ever existed, this is the one place one would expect to find it.

■ Such contemporaneous construction is entitled to great weight. See Tobin v. Edward S. Wagner Co., 2 Cir., 1951, 187 F.2d 977. A general statement of policy cannot serve as a price test or even as a modification of a price test specifically provided in the regulations. Cf. Bowles v. 870 Seventh Avenue Corporation, 2 Cir., 1945, 150 F.2d 819, 821, certiorari denied 1946, 326 U.S. 780, 66 S.Ct. 336, 90 L.Ed. 472; Federal Housing Administration v. Morris Plan Co. of California, 9 Cir., 1954, 211 F.2d 756, 758, modified 9 Cir., 1954, 214 F.2d 821.

### Was There a Special Rule?

■ Plaintiff argues, however, that even if this was merely a statement of policy it nevertheless became a Special Rule by reason of Class IV of Regulation 1 (Sec. 201.22(d) (4)).

Class IV reads, "Class IV—Special rules for certain commodities may be established, from time to time, by the Administrator." The government concedes that at no time did the Administrator ever publish in regulation form and cause to be printed in the Federal Register any such Class IV rule relating to crude oil. See: Administrative Procedure Act, Sec. 3, 60 Stat. 238 (1946), 5 U.S.C.A. § 1002; Federal Register Act, Sec. 5(a), 49 Stat. 501 (1935), 44 U.S.C.A. § 305(a). Plaintiff argues, nevertheless, that such "Special Rule," viz., that ECA will make payment only for purchases which are made at prices that approximate as nearly as practicable the lowest competitive market prices, was established by various statements made by the Administrator or his associates to the Congress; by the defendants themselves; by correspondence and other documents in the government's and defendants' files. Since the cumulative effect of such proof is relied upon, an

extended description of these statements and documents is necessary.

On December 3, 1948, the Administrator wrote to the chairman of the board of Caltex saying that it was of the utmost importance that ECA should have the benefit of the lowest competitive market price for shipments of crude oil financed through ECA, and since Caltex was one of the largest participators in the ECA oil program he asked for an understanding as to the prices which at that time appeared to be proper for ECA financing.

On February 14, 1949, the Administrator again wrote the chairman of the board of Caltex, and to other oil companies (but not any of the other defendants), stating that it was the settled *policy* of the administration that prices charged for crude oil in all ECA financed transactions should fully reflect competitive market conditions. He also stated that it was his understanding that Caltex was in agreement with this *principle* and that he was seriously concerned with the movement of Middle East crude oil into the United States and whether such movement could be regarded as temporary or sporadic. He stated as a fact that the imports of Middle East crude oil into the Western Hemisphere exceeded Western Hemisphere exports of crude oil to the Eastern Hemisphere. Consequently, he said, "the prices charged on such sales have an important bearing on the determination of the competitive market price at Middle East shipping points", and that the shippers reported value of shipments at point of origin from the Middle East (Iran, Kuwait and Saudi Arabia) to the United States has ranged from about $1 to $1.75 a barrel, which prices were considerably lower than the price of $2.03 a barrel f. o. b. Ras Tanura charged to ECA, and asked for explanation and comments.

On February 24, 1949, the chairman of the board of Caltex acknowledged the Administrator's letter of February 14th, and since it is claimed by the government to be of major significance it is quoted at length.

"Dear Mr. Hoffman:

"I have your letter of February 14th in which you raise certain questions regarding present prices of Middle East crude oil shipped to ECA destinations and I am pleased to provide the following information in this connection.

"I believe that our prices on such shipments fully reflect competitive market conditions. We follow the practice of establishing prices which permit our buyers in the various markets in which we sell, to land petroleum products in those markets on bases that will be fully competitive with products originating from any other source, and as such our prices are, in my judgment, proper for financing by your Administration.

"Since early in September, 1948, the Caltex group of companies has not negotiated any crude oil sales to buyers in the United States and, accordingly, the general question which you raise in your letter regarding the effect of sales in the United States, does not apply directly to us. However, I understand that some of our associated companies currently do make such sales and shipments and I understand that in fixing their prices, they are guided by the same commercial considerations of competitive market price requirements which is the basis on which we ourselves operate generally.

"Thus, when shipments of crude oil are made to USA destinations, I believe you will find that the delivered prices are generally in line with the prices at which competitive oils can be landed in the same markets. For instance, depending on quality, point of origin, posted prices at the well and the varying amounts of premiums which have been in effect during the past six months, the laid down prices of competitive crude oils of the general quality of Arabian crude would be of the order of $3.00 to $3.50 per barrel at North Atlantic ports of the United States. After deducting transport charges from the Persian Gulf to Eastern seaboard of the United States of approximately $1.70 per barrel, there would remain a netback f. o. b. Persian

Gulf of approximately $1.30 to $1.80 per barrel for Arabian crude oil. These netbacks are in the range of prices to which you refer in your letter.

"I believe that the shipments that have been made from the Persian Gulf to the United States are transitory in character being the result of the oil companies' attempt to meet a special, though temporarily critical, shortage condition in the United States that now is passing. As such, these shipments seem to have exercised the usual influence of marginal shipments in helping to rectify temporary abnormalities in the supply situation. Being of this character and of relatively small volume, they do not, in my opinion, represent a reasonable basis for fixing market prices for crude oils delivered in the major consuming areas in the Eastern Hemisphere on which the existence of the large volume of Middle Eastern production depends.

"We believe that the policy of meeting competitive prices in the markets in which we sell enables us to exercise the maximum of competitive pressure consistent with our available production facilities and that this pressure for markets has the effect of giving lower prices to all buyers in the long run.

"I hope the foregoing gives you the information which you require and will satisfy your administration regarding the questions which you raise in connection with Middle East crude oil prices for ECA destinations."

On March 1, 1949, Administrator Hoffman wrote a lengthy letter to Representative Sol Bloom, in which he answered several questions posed by the latter. Contained therein was the following sentence which thereafter was quoted extensively by ECA:

"It will, of course, be the position of this Administration in this and in related cases that prices realized on shipments of substantial quantities to any market are factors of great weight in ascertaining the *prevailing* market price at the source and that ECA must be given the benefit of such prevailing market price determined with due regard to such factors. Ultimate disposition of this particular matter must, however, await full analysis of all the facts and circumstances."

Shortly thereafter on March 11, 1949, the Administrator wrote to the chairman of the board of Caltex advising him that he had appointed a group of expert consultants to assist him in a full analysis of all the facts and circumstances involved in the matter of Middle East crude oil prices and that such group would hold meetings, at which his company's representatives could be present.

These consultants met on March 22, 1949, with representatives of Caltex and during the course of such meeting Caltex's representatives submitted a memorandum reading as follows:

### "Pricing of Middle East Oil

"Mr. Paul G. Hoffman, Administrator of ECA, recently inquired of certain oil companies regarding the prices charged by them for crude oil and petroleum products shipped from the Middle East to countries where ECA financing is involved. He desired to know whether such prices fully reflected competitive market conditions and were a satisfactory basis for financing by his administration.

"In order to understand this situation, it is necessary to have a general idea of the movement and pricing of crude oil and petroleum products in European markets.

"Until recently, the Eastern Hemisphere has never been able to produce sufficient crude oil for its own needs and the deficit has been supplied largely from oil fields located in the general area of the Gulf of Mexico. Consequently, the price of crude oil in the oil fields of the Gulf, plus the freight to the destination, has determined the price at which sales of crude oil are made for delivery to the Eastern Hemisphere.

"The Eastern Hemisphere has also never refined all of the petroleum products which it required. Today, the Eastern Hemisphere (excluding Russia) has a refining capacity of about 1,360,000 bar-

rels per day, whereas the oil consumption of that area is approximately 1,917,000 barrels per day. The deficit has been supplied largely by refineries located in the area of the Gulf of Mexico, and, accordingly, prices in the Gulf area, plus freight to destination, have determined prices at which sales of petroleum products are made for delivery in the Eastern Hemisphere.

"When Middle East crude oil became available for delivery in the European market, it was necessary to establish a price therefor which would compete with a comparable competitive grade of crude oil produced in the Gulf area. It was finally decided that Saudi Arabian crude oil of 36° gravity should be priced against Jusepin (Venezuela) crude oil; the delivered price of Jusepin oil was therefore used as a basis on which to determine the value of Saudi Arabian crude delivered at European ports.

"The recent price of Jusepin crude f. o. b. loading port in Venezuela, has been $2.57 for 32° gravity or $2.65 for 36° gravity. Add to this $.87 per barrel for freight to the chief ports of Northern Europe (Le Havre, Rotterdam, and Hamburg) and the total of $3.52 per barrel is the delivered value of Jusepin crude oil at these ports. Subtract $.04 per barrel as a refining value differential against Arabian crude and the result of $3.48 per barrel is the delivered value of Arabian crude oil at the same ports. Consequently, in order to compete with Jusepin crude at these ports, Arabian crude oil must be offered at not more than $3.48 per barrel delivered.

"Deduct from this delivered value of $3.48 per barrel, for Arabian crude at Northern European ports, the freight rate of $1.45 per barrel for delivering Arabian crude from Ras Tanura to such ports, and the remaining $2.03 per barrel is the net value for Arabian crude, f. o. b. Ras Tanura, for delivery in Northern Europe. This is the figure which has been actually used as the price of Arabian crude when the purchaser takes delivery in his own ships at Ras Tanura for shipment to Northern European ports where ECA financing is involved.

"The competitive situation in respect to deliveries of crude oil to ports in Southern Europe is similar to that of Northern Europe, except that the freight on Jusepin crude is higher and on Arabian crude lower. For instance, the freight on a barrel of Jusepin crude from Venezuela to Marseille is 90¢ a barrel, making a delivered price for Jusepin crude at that port of $3.55 per barrel; whereas, the freight rate on Arabian crude from Ras Tanura to Marseille is $1.14 per barrel which, added to a price of $2.03 per barrel at Ras Tanura, makes a delivered price of $3.17. Similarly, the delivered price of Jusepin crude at Trieste is $3.72 per barrel; whereas, the delivered price of Arabian crude at Trieste is $3.13 per barrel. On the basis of actual value of crude oil at Marseille and Trieste, there would be complete justification for delivered prices of Arabian crude of $3.51 and $3.68 (4¢ less than Jusepin crude). The actual delivered prices of Arabian oil at these points saves the ECA 38¢ and 99¢ per barrel as against Jusepin crude.

"Furthermore, the price of $2.03 per barrel f. o. b. Ras Tanura is equivalent to 28¢ per barrel less than E/W Texas crude of the same gravity delivered at the Northern European ports, and 80¢ and 91¢ less than E/W Texas crude of the same gravity delivered at Marseille and Trieste, respectively. See the attached Schedules I and II for a comparison of the prices of Arabian crude with Jusepin and E/W Texas crude.

"It should be emphasized that the price of $2.03 per barrel, f. o. b. Ras Tanura, for Arabian crude is very low compared with a price of $2.65 per barrel for Jusepin crude and a price of $2.79 per barrel for E/W Texas crude, both also at loading ports. There is no assurance that, even at prices equal to the loading port prices of Jusepin and E/W Texas crude oil, oil produced in Arabia would ultimately return to the companies involved their investment in the Arabian

venture, as so much depends upon the great political risk involved.

"From the foregoing, it ought to be clear that the pricing of Arabian crude on a basis that nets back $2.03 per barrel at Ras Tanura on deliveries to European countries where ECA financing is involved, does more for the purchaser than simply reflect competitive market conditions in that area. However, Mr. Hoffman made reference to certain deliveries of Arabian crude in the United States at prices reported to have ranged from $1.00 to $1.75 per barrel, f. o. b. Ras Tanura, and this requires some further explanation.

"It should be borne in mind that because of the distance involved, and the resulting high cost of transportation, Arabian crude oil is a marginal product in ports in the United States. The U.S. M.C. freight rate from Ras Tanura to New York is today about $1.68 per barrel, whereas the rate on Jusepin crude to New York is $.38 per barrel. Consequently, the net back for Arabian crude at Ras Tanura on sales of Arabian crude for delivery at New York (for instance) in competition with Jusepin crude would today have to be not more than about $1.31 per barrel (See Schedule III). Any sales of Arabian crude to any purchaser for delivery on the Eastern seaboard of the United States would have to reflect this situation, and, in so doing, would be truly representative of competitive market conditions.

"It should be clearly recognized that the Western Hemisphere is not the natural outlet for Persian Gulf oil. However, during the time of short supply in the United States certain arrangements were made to bring crude into the Western Hemisphere, and part of the quantities at least that are now being imported are a carry-over from that period. Therefore, the crude that has moved into the Western Hemisphere has served principally as a marginal supply and is likely to remain just that. In addition to the marginal supply that has been shipped into this country, there has also been a quantity of Middle East crude shipped here because of the shortage of refining capacity in the Eastern Hemisphere."

Schedule I

Comparative Per Barrel Prices of Jusepin and Arabian 36° API
Gravity Crude Oil At European Ports

| | Price at Loading Port | Freight to Destination Port* | Price at Destination Port | Arabian Port lower than Jusepin |
|---|---|---|---|---|
| | Le Havre, Rotterdam, Hamburg | | | |
| Jusepin | $2.65 | $ .87 | $3.52 | |
| Arabian | 2.03 | 1.45 | 3.48 | $ .04** |
| | Marseille | | | |
| Jusepin | $2.65 | $ .90 | $3.55 | |
| Arabian | 2.03 | 1.14 | 3.17 | $ .38** |
| | Trieste | | | |
| Jusepin | $2.65 | $1.07 | $3.72 | |
| Arabian | 2.03 | 1.10 | 3.13 | $ .59** |

* U.S.M.C. Rates.

** Jusepin crude of 36° gravity has a refining value of about $.04 per barrel more than Arabian crude of same gravity.

Schedule II

### Comparative Per Barrel Prices of E/W Texas and Arabian 36° API Gravity Crude Oil At European Ports

|  | Price at Loading Port | Freight to Destination Port* | Price at Destination Port | Arabian Price lower than E/W Texas by |
|---|---|---|---|---|
| **Le Havre, Rotterdam, Hamburg** | | | | |
| E/W Texas | $2.79 | $1.62 | $3.81 | |
| Arabian | 2.03 | 1.45 | 3.48 | $ .33** |
| **Marseille** | | | | |
| E/W Texas | $2.79 | $1.13 | $3.92 | |
| Arabian | 2.03 | 1.14 | 3.17 | $ .75** |
| **Trieste** | | | | |
| E/W Texas | $2.79 | $1.30 | $4.09 | |
| Arabian | 2.03 | 1.10 | 3.13 | $ .86** |

\* U.S.M.C. Rates.

\*\* E/W Texas crude of 36° gravity has a refining value of approximately $.05 per barrel more than Arabian crude of same gravity.

Schedule III

### Value of Arabian 36° API Gravity Crude Oil Compared With the Price of Jusepin Crude Oil for Delivery at New York

|  | Price or Value at Loading Port | Freight to New York* | Price or Value at New York |
|---|---|---|---|
| Jusepin | $2.45 | $0.38 | $3.03 |
| Arabian | 1.31*** | 1.68 | 2.99** |

\* U.S.M.C. Rates.

\*\* Jusepin crude of 36° gravity has a refining value of about $.04 per barrel more than Arabian crude of same gravity.

\*\*\* For delivery in New York in competition with Jusepin crude.

During the course of the conferences the following colloquy took place between one of the consultants and the representative of Caltex:

"Dr. Mason (ECA): The price of $2.03 is justifiable competitively so long as Europe needs, on balance, shipments from the Western Hemisphere which determine delivered price in Europe. Once Persian Gulf crude supplies expand sufficiently to supply Europe that justification ceases.

"Mr. Ernst (Caltex): A new set of forces comes into play."

After the meeting of the consultants with representatives of Caltex the Administrator on March 25, 1949, wrote to the chairman of the board of Caltex that he had adopted the following unanimous conclusions of the experts,

" 'Although the relatively large net imports of crude oil into the Western Hemisphere in late 1948 and early 1949 were the result of special circumstances not expected to

recur, it is apparent that available Middle East supplies of crude oil will during 1949 be approximately adequate, and perhaps slightly more than adequate, to meet European requirements. Under these circumstances, the present formula [1] by which ECA authorizes a maximum price for purchases of Middle East oil, which formula was based on European needs of Western Hemisphere oil, is ceasing to be justified. The adjustment of prices to the developing supply situation, as frequently happens in many markets, may well have lagged behind the emerging supply situation.

" 'While your committee is not prepared to recommend abandonment of the price of $1.99 for 34° API gravity Saudi Arabian crude oil f. o. b. Ras Tanura, at the moment, it is convinced that the companies should be asked to study the question of bringing present prices into line with the developing supply situation. At the same time, the ECA should reconsider the present formula with a view to the possibility of its abandonment.'

"ECA fully concurs in the conclusions of this group. Accordingly, you are requested to re-examine your prices on sales of Middle East crude oil to ECA destinations with a view to revision in the light of the developing supply situation.

"It is urgent that ECA be advised at your earliest convenience as to the result of your reconsideration of these prices. Not only must a decision be reached promptly as to the level of prices which may be considered satisfactory for ECA financing, but estimates as to cost of Middle East crude oil to be financed by ECA must be furnished to the Congress and its Appropriations Committee in the very near future. We understand that hearings on ECA Appropriations have been scheduled to begin on April 4."

As a result of the exchange of these letters plaintiff argues that the government accepted the defendants' explanation that the movement of Middle East oil to the Western Hemisphere was sporadic and that the sales in the United States and Canada did not represent a reasonable basis for fixing market prices for Middle East oil delivered in Europe, and it finds some support in the testimony of two of the consultants, Dr. Mason and Sumner Pike. However, Caltex replied to the letter on April 4, 1949, and in such letter stated that it explained that the price of Middle East crude had been established on a competitive basis and that its memorandum, which it gave to the group, outlined the facts upon which these prices were established. It pointed out that the Administrator himself, in a letter to Congressman Sol Bloom, told Congress that ECA figures indicated a saving of 28¢ to 91¢ a barrel for shipments to ECA countries from the Persian Gulf, and insisted that the price established for Arabian crude was on a competitive basis and that it was eminently fair for financing by ECA. The writer concluded that it would be unreasonable to ask for a further reduction in the price.

Regulation 1 was amended on May 3, 1949, and for the first time contained the quoted phrase outlining the policy of ECA, "It is the policy of ECA to make payment only for purchases of commodities, * * *, which are made at prices that approximate, as nearly as practicable, lowest competitive market prices." And for the first time it included the comparable sales test.

The government relies heavily on a statement made by one of ECA's top executives before Congress some six months later, specifically in November 1949, in connection with hearings by the Select Committee on Small Business when that Committee was considering

[1]. The formula here referred to and mentioned infra, pp. 140, 146 of 155 F.Supp. by Dr. Bransky and Dr. Stocking is the formula stated in the statutory test which, incidentally, is the same as the high of the range.

the effects of foreign oil imports on independent domestic producers. At that hearing, Mr. Hull (of ECA) testified in response to questions by Congressman Ellis that ECA had a *regulation* which in substance limited the offshore price of crude oil to the market price established under competitive market conditions, and that although this regulation was not in effect until May 3, 1949, the policy that ECA would insist upon receiving the benefit of existing market conditions was in effect as an operating policy long before it was incorporated in a formal regulation. In fact, he said, the Administrator had pointed out to Congressman Bloom as early as March 1, 1949, that such changes in the regulation were contemplated and that their policy always had been to insist upon receiving the benefit of competitive conditions affecting the price at the source of the commodity even though they had not been formally incorporated in a regulation.

On November 1, 1949, the ECA consultants were recalled to reexamine the Middle East crude prices then being financed by ECA because there was a considerable flow of Middle East oil going to the Eastern seaboard of the United States. This meeting of the experts, a transcript of which is in evidence, resulted in the following recommendation insofar as it relates to crude oil:

"Your committee notes with approval that, since its last meeting, the price of crude oil f. o. b. Persian Gulf ports has declined by 28¢ a barrel. The present figure appears to be close to the delivered price at American East Coast ports less tariff and competitively determined transport costs from the Persian Gulf. The price f. o. b. so determined is the minimum price that Persian Gulf producers can expect to receive. If Near East production flows regularly and in volume to the United States, this price would also, under competitive conditions, be the maximum price such producers could expect to receive. Your committee

expresses no opinion on the prospective world flows of crude petroleum. It recommends, however, that any substantial rise of crude oil prices above U. S. East Coast prices, less tariff and competitively determined transport cost from Persian Gulf ports, should call for renewed examination by ECA of the price at which it finances shipments of crude oil from Persian Gulf ports."

In short, the experts felt that the price of $1.75 f. o. b. Ras Tanura was the minimum price that the Persian Gulf producers could expect to receive and that, if the Middle East production flowed regularly and in volume to the United States, the $1.75 price would, under competitive conditions, be the maximum, and recommended that any substantial rise over U. S. East Coast prices less tariff and freight from the Middle East should call for re-examination. This conclusion was not even sent to any of the defendants and when Socal asked for a transcript of the conference, its request was denied.

Shortly thereafter Dr. Bransky, Acting Chief of the Petroleum Branch of the ECA, testified before the Select Committee on Small Business of the Congress and in part discussed Middle East oil price problems. Among other things he stated, "The principles governing ECA financing are now embodied in ECA Regulation 1, as amended May 15, 1949, which specifies that wherever practicable ECA must be given the benefit of the lowest competitive market prices. Under § 112(*l*) of the ECA Act, of course, prevailing United States prices plus freight from United States to destination cannot be exceeded. But in addition the price must not exceed the competitive market price at the source of the commodity * * *.

"With respect to crude oil, application of the principle that prices on ECA financed sales must be fully competitive resulted in payment for United States crude oil at the posted price plus transportation and customary charges. * * * The Venezuelan crude oil price presented

no special problem, since the price in Venezuela was generally determined so as to equalize laid down costs with the United States Gulf oil on the eastern seaboard of the United States.

"Difficult questions were raised, however, by the price of crude oil in the Persian Gulf. The price generally prevailing between April 3 and July 1, 1948, was $2.22 a barrel for 36 degree API gravity oil f. o. b. Ras Tanura * * *.

"On the latter date Standard Oil of New Jersey established its crude-oil price f. o. b. Ras Tanura under a formula as follows: The Caribbean price for comparable Venezuelan crude oil plus freight from the Caribbean to Western Europe minus freight from the Persian Gulf to the same destination. The resulting price was $2.07 (a later adjustment reduced this price to $2.03) a barrel for similar crude oil. Other suppliers effected corresponding reductions in their prices for Mid East crude oil.

"Upon analysis it appeared that the determination of the crude-oil price f. o. b. the Persian Gulf in this manner qualified as a competitive market price. The underlying logic of the formula[2] was that crude oil produced in Venezuela was then moving in sizable quantities to alternative markets, the east coast of the United States and Europe * * *."

After outlining the action of the consultants and their conclusions referred to above and the reduction of crude oil prices following reductions by Gulf Oil Company to the price of $1.75 f. o. b. Ras Tanura, he stated, "The price of $1.75 a barrel for 36 degree API gravity Saudi Arabian crude oil f. o. b. Ras Tanura approximated as of October 1, 1949, the delivered price at the American east coast less tariff and current transportation costs from the Persian Gulf. ECA determined in October 1949 to submit to the same group of consultants for their consideration and advice the question whether the present price represented an adequate response to their recommendation of the preceding March." He

then concluded his discussion of Middle East prices by quoting the recommendations of the consultants dated November 2, 1949, quoted above.

All of this proof, the government contends, establishes a *Special Rule* for determining eligible Middle East crude prices and under such Special Rule the price then being charged in November 1949 of $1.75 f. o. b. Ras Tanura was a price tested by a formula that met the test of lowest competitive market price. It was on this theory, the government contends, that the ECA Administrator expressly approved that price on August 22, 1950. This letter, which dealt primarily with refined products, included the following sentence. "We understand that with respect to * * * shipments of crude oil from all off-shore sources, your practice conforms to the requirements of the May 3 revision." What is extremely significant is the difference between this language and language contained in a proposed draft of the same letter—"We also understand that, with respect to shipments of crude oil, your practice conforms to the requirements of *Section 201.22(e) (2) (i)* of ECA Regulation 1, in that *the netback price realized* on exports to any participating country does not exceed the netback price realized on any other exports of crude oil from the Persian Gulf, including exports to the United States." It would seem that if any formula existed ECA would not purposely delete all reference to it when specifically approving the prices charged by defendants.

But commencing September 1, 1950 and continuing to August 31, 1952, plaintiff alleges the $1.75 price did not meet this Special Rule-Formula Test because the watershed of competition was at the United States East Coast inasmuch as the net flow of Middle East crude was to the Western Hemisphere, and because during such period freight rates rose and netbacks declined.

While it is undoubtedly true that the Administrator could promulgate special

2. See footnote 155 F.Supp. 138.

rules for crude oil the plain unvarnished fact is he did not. The facts in support of such Special Rule (absent the necessary publication in the Federal Register) fail to sustain its existence or show the slightest reason why the defendants, or some of them, should be bound by it. The most that can be said for the underlying documents and testimony before the court is that ECA frequently and publicly announced to the world, and specifically to some of the defendants, that it would insist upon its basic policy, i. e., it should have the lowest competitive market price. But that policy or objective was clearly stated in Regulation 1 and duly published in the Federal Register for all to read.

Mr. Hoffman testified on trial that he intended, while he was Administrator, to handle crude oil under Class IV but he frankly admitted that the rules had to be published in the Federal Register. At no point during the entire administration of ECA did any responsible government executive claim that there was a Special Rule for crude oil. On the contrary, defendants' Exhibit 189 shows clearly and unequivocally that there was no such rule. In that document the Comptroller General of the United States wrote to the ECA Mission in The Netherlands on July 15, 1949, that, "ECA Regulation 1 goes as far as is practicable in placing the supplier on notice of his responsibilities with respect to prices charged on ECA-financed sales. It would be administratively difficult, if not impossible, to try to achieve our price objectives by concentrating our efforts on sellers. *By regulation, sellers cannot be required to sell at the lowest competitive prices.*" Another contemporary construction as late as March 8, 1951, by the Associate General Counsel of ECA is to like effect. At that time when he was explaining to some of the defendants the government's threatened lawsuit he stated that the lowest competitive market price phrase in the regulations was a statement of policy and pointed out that there were three price fixing rules specifically provided for. Eliminating one rule not applicable i. e., the statutory test, which all concede has been complied with, he said, in substance, that there were two rules for fixing prices, one was the individual supplier's test and the other the principal supplier's test.

Plaintiff relies heavily on the experts' November recommendation to establish its formula. But a reading of the transcript of that meeting makes it clear beyond all peradventure of doubt that, whatever else the experts did, they emphatically refused to adopt any formula. For example, Dr. Stocking, one of the experts, referring to the formula said, "as I understand it, neither a majority of this committee nor ECA itself is prepared at this moment to accept that principle." He was not contradicted. Mr. Wescoat, another expert, stated in a letter to ECA "that the establishment of no pricing formula was involved since the question the Committee was to determine was one solely as to whether or not prices were competitive." We shall content ourselves with these two references, although many more are contained in the record.

Plaintiff also relies in large measure on the language quoted in the Sol Bloom letter (supra, 155 F.Supp. 134). The difficulty, however, is that this language is susceptible of several interpretations. It may, as the government contends, be a statement of the formula. If so, it is a very oblique reference. But it can just as easily be regarded as a statement of the comparable sales test. In other words, prices realized on shipments to the Western Hemisphere are factors of great weight in ascertaining the prevailing market price at the source, not by reason of any high and low of the range theory, but because such shipments constituted comparable sales, and ECA was insisting on prices at least as low as those on non-ECA financed transactions. This latter interpretation is borne out by the record, especially the transcript of the March 1951 conference with Caltex, the ECA memo summarizing this conference and similar ones with other Middle Eastern suppliers, and the pro-

posed draft of the August 22, 1950 letter approving defendants' prices.

Dr. Bransky, Chief of ECA's Petroleum Branch, in his deposition testified over and over again that ECA never adopted any such formula; that there was never any mathematical definition of lowest competitive market price; that the word "price" as used in the Regulations did not mean "netback"; that the March 25, 1949, letter to Caltex was not a policy announcement; that $1.75 was a fair and reasonable price; and that the netback computation was an analytical device and not a formula. As late as April 19, 1951, after the "show cause" letters had been sent out we find ECA saying, in a detailed analysis of the entire problem, "It is not our position that ECA should go so far as to insist on the price realized by Middle East suppliers on substantial shipments to the Western Hemisphere."

Finally, if anything further need be said, we have only to compare ECA's actions concerning crude oil with its conduct respecting refined products. The products controversy was highly complicated and hotly contested. We need not go into the matter here except to say that ECA was insisting on prices which did not exceed netbacks realized on sales to the most distant market (the same formula as is here in issue). But in that instance ECA specifically adopted, and published in the Federal Register, Amendment V, which explicitly made the formula mandatory. The inference to be drawn from its failure to do so with respect to crude oil is overwhelming.

We think what has already been said is more than sufficient to establish that no Special Rule was ever adopted. Consequently, we shall refrain from further citing the record although we could do so at considerable length. We find, therefore, on all of the evidence that there was no Special Rule.

## Agreement Theory

Count III of the complaint alleges that the defendants agreed with the plaintiff to charge no more than the lowest competitive market price, and that this agreement was breached by not pricing in accordance with the formula.

The government, we feel, does not press this point too strenuously but since it is in the complaint and the government's memorandum after trial attempts to support it, it requires some discussion.

In a pretrial stipulation plaintiff identified some 27 documents (two were duplications) and after trial, 21 documents, as the basis for such an agreement. Not one has even the slightest suggestion of a contract. Most are internal memoranda exchanged between ECA executives. One is a transcript of a conference of experts at which the defendants were not even present. A letter from ECA to a U. S. Senator relied upon prior to trial is not relied on after trial. Thirteen are letters between ECA and some of the defendants. While it is true that these letters from the government reiterate its policy of seeking the lowest competitive market prices, the responses thereto are that the prices charged were truly competitive. Nowhere is there any contractual statement agreeing on any formula or netback theory. In fact that theory was specifically rejected by Caltex so far as Middle Eastern prices to European customers were concerned.

Plaintiff attempts to prove an agreement by arguing that the Caltex memorandum (supra, 155 F.Supp. 134), and in particular Schedule III thereof, implicitly recognizes the validity of its formula because Caltex priced its crude oil in such a way that it approximated the high of the range.[3] This attempts to prove too much. Caltex arrived at the $2.03 price after an analysis of the competitive realities of the market situation. If two or more parties sell fungible goods in the same market all must charge the

3. While Caltex doesn't say so, it should be noted that the $2.03 price exactly satisfies the statutory test.

same price, for whoever charges the least will capture the entire market. The memorandum contains not the slightest hint of reliance on any theoretical formula. If in fact Caltex had adopted the formula it would have charged higher prices on its sales to Southern Europe. ECA's internal memoranda make it perfectly clear that it was well aware that the $1.75 price, at least, was not determined by the use of any formula. Furthermore, it must be remembered that the Caltex memo was in response to a request to justify prices. If any theory existed by which such prices could be rationalized Caltex was not averse to using it. Nor, for that matter, was ECA reluctant to rationalize its practices under close Congressional questioning. The memorandum establishes nothing more than the fact that Caltex knew, if it wished to sell in any particular market, that it must meet or better the prices of its competitors.

Even if it could be said that there was an agreement between plaintiff and some of the defendants to charge the lowest competitive market price,[4] there would remain the legal question as to whether such an abstract price norm would be legally sufficient. Cf. Connally v. General Construction Co., 1926, 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322. If such a price was to be determined by a formula not made part of the agreement obviously it is further deficient in a legal sense. But there is no need to dwell on this phase, the exhibits and proof are all too vague and illusory to form the basis of any agreement. At most they represent a continuous expression of conflicting views never rising to the dignity of an agreement in law or in fact.

Consequently we find that there was no provision in the Statute or Regulations, no Special Rule and no agreement which required defendants to price their crude oil at the low of the range according to plaintiff's formula. The first cause of action must therefore be dismissed.

### Flow, Shortage and Freight

■ However, we will assume for the purposes of this opinion that the formula was binding upon defendants. Plaintiff is still faced with the problem whether or not those factors existed which would call it into play. In other words, was the watershed, in fact, on the East coast of the United States during 1950–1952? The evidence on this point is far from convincing. In November 1949 the experts refused to consider the question—some expressing doubts as to where the watershed was, and others pointing out that it was an extremely complex matter. At least as late as mid-1951 Walter Levy, on whom plaintiff relies so heavily for the formula, apparently thought the time had not yet come to price Arabian crude oil at the low of the range.

There is, of course, no question that during the period of this lawsuit Middle Eastern oil was moving to the Eastern seacoast of the United States. The total flow of crude oil to the Western Hemisphere during 1950–1952 was at least 205,900,000 barrels,[5] or 9–8/10% of Middle Eastern production and 2–3/10% of Western Hemisphere supply. The net flow of crude during the same period was at least 67,700,000 barrels, or 3–2/10% of Middle Eastern production and 7/10% of Western Hemisphere supply. An analysis of the yearly figures discloses that the trend was an ever increasing one except for 1951 when imports fell back to the 1949 level. But it also seems undisputed that everyone—experts, defendants and ECA—considered the Eastern

---

4. There seems to be no doubt that defendants agreed generally that ECA was entitled to the lowest competitive market price, but they never agreed on how such a price was to be determined. Indeed, they insisted all along that their prices were, in fact, the lowest competitive market prices since no one in Europe could buy oil for less.

5. These are defendants' figures. Plaintiff's Demand for Admissions, based on Bureau of Census and Dominion Bureau of Statistics reports, show total imports of 175,058,191 barrels for the same period.

Hemisphere the natural market for such oil. The Western Hemisphere was never expected to be more than a marginal market because of the distances involved.

A number of complicating factors render the situation even more uncertain. There was a very serious shortage of oil in this country in 1947–1948 as a result of which the oil companies with Middle Eastern resources were urged by the Government to rapidly develop their facilities to meet the emergency. This they did at a considerably faster pace than they otherwise would have. After the crisis was successfully met, Persian Gulf production was excessive, yet due to Saudi Arabian desires for royalties, cutbacks were difficult. The excess was apparently finding its way into the United States. But this excess was in part, at least, created at the insistence of the Government, and we question the propriety of permitting it now to take advantage of a situation for which it was partially responsible.

A far more serious problem concerns which flow should be considered for the purposes of determining the watershed. The net flow of crude oil was to this continent. But the net flow of crude and products was toward Europe. During 1950–1952 this net combined flow, after deducting all east-to-west shipments, totaled 362,300,000 barrels, or 4% of Western Hemisphere supply and 17% of Middle Eastern production. It is difficult to separate the products and the crude for these purposes. Crude oil in its natural state is of small commercial value. It must generally be refined into products before it can be used. There is no question that during this entire period Europe was short of refining capacity. In fact, ECA was seriously concerned with alleviating this situation. Europe imported as much crude oil as its refineries could handle. But this was insufficient to satisfy its needs for petroleum products. The oil companies, in order to supply the European demand for products, consequently imported crude oil into this country where sufficient refining capacity existed, and then exported the refined products back to Europe. This abnormality in the world petroleum situation further encouraged the flow of crude oil to the Western Hemisphere.

Superimposed on these conditions were the Korean War and the Anglo-Iranian shutdown. Whether or not there was a world shortage or excess of crude oil is immaterial. The peculiarities of the petroleum industry are such that oil is usually located at great distances from the refineries and these refineries are frequently far from the areas where the oil is needed. Even though there may be sufficient petroleum at the source, there may, none-the-less, be serious shortages elsewhere. Thus, after the Korean War broke out there was a very serious shortage on the West Coast of the United States inasmuch as those reserves were called upon first to meet the emergency. As a result Socal was compelled to import Arabian crude to keep its West Coast refineries running. (Texas' position in 1949–1951 provides a somewhat different example of the dislocations which can arise in the industry. Even though the shortage in this country was over by then, Texas was still experiencing a shortage of crude at its Port Arthur refineries due to the difficulties in getting its Texas pipeline into operation.)

The shutdown of the Abadan refinery in June of 1951 was a staggering blow. It meant the loss of approximately 660,000 barrels of crude oil per day—more than one third of all Middle Eastern production. But of far greater consequence was the loss of 510,000 barrels per day of refined products. This gravely aggravated the already delicate supply and demand balance caused by the extraordinary needs of the military in Korea. So serious was the emergency that the Secretary of the Interior and the Petroleum Administrator for Defense immediately set up the Foreign Voluntary Aid Program and the Foreign Petroleum Supply Committee to secure the concerted action of all the international oil companies in an effort to avoid a crisis of truly major proportions.

In view of all these factors we find it extremely difficult to determine the precise location of the watershed. We need not go so far as to find that it was not at the Eastern seaboard of the United States. We only decided that the burden of proof on this issue is on the Government, and that it has failed to persuade us. Its evidence respecting percentage increases and decreases in world petroleum stocks is meaningless in the absence of evidence concerning the size of the stocks and their relation to the supply and demand picture.

While these problems are serious enough, they pale into insignificance in comparison with the problems which surround "competitively determined freight rates." To the uninitiated, the determination of a freight rate might seem a relatively simple matter. Such however is not the case. In the first place there is the problem of which rate to consider— the rate based on the cost of running a company owned fleet, the spot market rate, a consecutive voyage rate, or a long term fixture? The Government has unhesitatingly chosen the least significant rate—the spot market rate. Spot charters constitute something between five and ten percent of the tanker market and fluctuate violently. In this case company owned fleets constituted about 70% of tanker capacity, the remainder being supplied by long term charter. Spot rates become significant only as a marginal adjustment—i. e., if the company miscalculated its tanker needs it would utilize the spot market to charter additional tonnage or to outcharter its excess avails.

However, the Government's reason for choosing the spot rate is quite obvious. If, as would seem logical, the cost to the defendants of operating their own and long term chartered fleet was the proper rate, there would be no overcharge as this freight factor netted back "prices"

that approximated very closely those charged. If, on the other hand, it had chosen long term charter rates, the Government was in a dilemma since there was no market rate for such fixtures. Too many variables enter into the rate fixed for each long term charter. Consequently, the Government had to choose the spot market rate by the process of elimination.

Defendants strenuously contend that there is no such thing as a going spot market freight rate, and with this we are in complete agreement. Despite plaintiff's insistence to the contrary, even ECA found it impossible to determine such rates, and questioned their validity even if they could be ascertained. Thus in November 1949 the Director of the Transportation Division conceded that open market rates "might bear no resemblance to the freight cost of a major oil company importing crude in its own or term chartered tanker". When the products controversy was being discussed, the Director of the Industry Division stated "it would be necessary for ECA to arbitrarily establish some uniform 'going' rate below USMC [6] because there is no method by which 'going' rates can be realistically determined". A further memorandum indicates that "the prime difficulty in finding out what a fair market for tankers is at any particular time is that there is in fact no real world market * * * A market rate cannot be estimated by examining a few selected tanker fixtures when there are in excess of 2,000 tankers in the world operating at one time. Charters on ten or twenty tankers over a period of six months do not establish a rate. Nor, do they establish a trend". To like effect is a statement by Dr. Oppe that certain freight rate graphs "could only indicate prevailing trends and by no means could indicate a definite market rate for any specific sized vessel as of any date". We

6. As a matter of convenience and ready reference the industry employs the term "USMC." This abbreviation refers to a schedule of rates prepared by the Maritime Commission during World War II for carriage between major seaports of the world. After the war it became a common practice in the shipping industry to quote tanker rates in terms of percentage above or below U.S.M.C.

have the Director of ECA's Transportation Division again saying "it is impossible and impractical to make daily determinations or even a monthly determination of what a going freight rate might be in each of the trades on the tanker market". Finally, Dr. Stocking, one of ECA's experts criticized the agency's handling of the crude oil pricing situation with special reference to the freight rate problem. He agreed with Dr. Mason, another expert, that "the whole thing turns on this question of what actually is the freight rate". He then went on to say, "ECA's original pricing formula [7] by which the $2.03 price was determined is at best a makeshift. But its adoption was justified on the assumption of a fixed freight rate as represented by the official USMC rate * * * The formula as thus used affords an arbitrary but none-the-less logical basis for determining a so-called 'competitive price'. * * * But with fluctuating freight rates, the formula leads to highly anomalous results. The demand for ocean tankers is a derived demand reflecting changes in the demand for petroleum and its products. An increase in the demand for crude and its products would ordinarily bring an increased demand for ocean tankers and an increase in ocean tanker rates. Under the formula this leads to a lower not a higher f. o. b. price for Middle East crude. That is, as the demand for it increases Middle East crude sells for less. Conversely, a decrease in the demand for petroleum and petroleum products leads to a decrease in the demand for tanker services, but under the formula it leads to a higher f. o. b. price for Middle East crude. That is, as the demand for it decreases, Middle East crude sells for more. With fluctuating freight rates the formula is in reality a device for ascertaining how much an oligopolist can realize on sales to its most distant and least profitable market, not a device for determining the price at which competitors would sell. * * * Neither its historical origin nor its logic justifies the use of fluctuat-

ing transport rates in applying the formula".

Plaintiff called two tanker experts as witnesses, but they were unable to afford the Government much comfort. John Dietze testified that he would be unable to quote a current market freight rate without knowing, among other things, the size of the vessel, the area of the voyage, the type of charter, the currency to be used in payment, the type of vessel, the speed of the vessel, its flag, the date of availability, and its ability to backhaul. In response to a question as to whether the term "competitively determined transport costs" had any accepted meaning in the tanker brokerage business, he replied that it did not. The other expert, from Gulf Oil Company, summed matters up rather succinctly by testifying that he estimated the spot market by looking into a crystal ball.

In view of this overwhelming evidence from ECA documents and plaintiff's own witnesses, we do not feel any need to discuss the multitudinous graphs, charts and statistical summaries which plaintiff has introduced in evidence. Suffice it to say that these various documents, recording some but by no means all spot market fixtures, show violent fluctuations from USMC minus 35 in November 1949 to USMC plus 200 at the height of the Korean and Iranian crises. Further indication of the instability of the market may be found in the fact that ECA financed freight at different rates on the very same day. And finally, there are inconsistencies between the rates reported by the various brokers.

There can be no question that ECA fully recognized the difficulties in working with the spot market with its violent fluctuations. Mr. Hoffman authorized Caltex to use USMC flat in calculating transportation adjustments under the statutory test, and a fixed freight rate was specified in Amendment V (relating to petroleum products). In effect, these two rulings repudiate both the use of spot market rates and the use of fluctuat-

---

7. See footnote 155 F.Supp. 138.

ing rates. While USMC flat is a spot rate it does not necessarily bear any resemblance to the actual spot rate at any given moment. And, of course, the use of USMC flat establishes a uniform and rigid rate. In the light of these actions by ECA we are unable to find any justification for use of the fluctuating spot rate, even assuming it bore any relation to the realities of this case and could be determined.

But plaintiff ignores all of this and insists on using spot market rates in calculating net backs to the Persian Gulf despite the fact that in every month save one during the period of this lawsuit this would have compelled defendants to sell their crude oil below cost, and in ten of those months would have required them to pay the buyers up to $1.24 per barrel to take the oil off their hands! This, indeed, is a novel way to conduct a business and we suspect defendants' stockholders might have had a legitimate complaint had defendants indulged in such fanciful pricing policies just to secure ECA financing. In an attempt to overcome this absurdity plaintiff has waived any claim for refunds based on net backs at less than cost. Defendants are thus reduced to the status of non-profit organizations. This modification—the $1.43 floor—sounds suspiciously as though the Government has turned the full circle and has reverted to its initial abandoned complaint. But even if this is not quite accurate, it is a complete repudiation of the formula theory.

### Treating All Defendants as One

Turning now to that portion of the complaint which alleges a violation of the comparable sales test, we are faced at the outset with the problem of whether or no these six defendants may be treated as one. This question is crucial because unless all defendants are treated as one there can be no recovery based on the comparable sales theory since it is undisputed that all sales made by Oceanic and Mid-East either to affiliates or outsiders, ECA financed or not, were at $1.75 f. o. b. Ras Tanura and $2.41 f. o. b. Sidon. To avoid this result plaintiff urges that Socal and Texas were joint adventurers. This, both Socal and Texas deny and assert further that plaintiff has adduced no evidence tending to prove facts which would justify piercing the corporate veil.

It is undisputed that in 1936 Socal through its wholly owned subsidiaries Bahrein and California-Arabian Standard Oil Company, owned important oil concessions on Bahrein Island and in Saudi-Arabia. However, it had no marketing facilities in the area, either east of Suez or in Europe. Texas, on the other hand, had developed markets in those regions but was forced to supply them from the Western Hemisphere since it had no oil resources in the Middle East. Thus the two companies' needs in the area complemented each other. Accordingly, an agreement was entered into (the terms of which are not before us) whereby Texas bought for cash a one-half interest in California-Arabian (the predecessor of Aramco) and transferred to Bahrein its marketing facilities east of Suez for one-half of Bahrein's stock. Caltex was then organized as a wholly owned subsidiary of Bahrein to supply crude oil and products to the newly acquired markets.

This arrangement continued until 1947, at which time Socal purchased Texas' European markets and added them to Caltex. Oceanic was then organized to supply all the Caltex markets and Caltex became a service organization. Shortly thereafter Mid-East was organized to supply the expanding European market. Oceanic and Mid-East were owned 50% by Socal and 50% by Texas through its wholly owned subsidiary Texpet.

Also in 1947 Socal and Texas became aware of the desirability of constructing a pipe line from Saudi Arabia to the Eastern Mediterranean. The task of financing the project, however, was considerable and in order to raise the necessary capital Jersey and Socony were invited to purchase a 30% and 10% interest, respectively, in Aramco. The four companies then formed the Trans-Ara-

bian Pipeline Company and built the needed facilities.

■ Precise definition of a joint venture is difficult. The cases are of little help since they are generally restricted to their own peculiar facts. "Each case in which a coadventure is claimed * * * depends of course for its results on its own facts, and owing to the multifariousness of facts, no case of coadventure rises higher than a persuasive precedent for another." Harris v. Morse, D.C.S.D.N.Y.1931, 54 F.2d 109, 113.

■ Joint ownership by itself is not sufficient to create a joint venture, Bowmaster v. Carroll, 8 Cir., 1928, 23 F.2d 825, nor is a mere community of interest, Hasday v. Barocas, Sup.1952, 115 N.Y.S.2d 209. Many factors are taken into consideration by the courts in determining whether the relationship exists. To begin with, it is a voluntary relationship, the origin of which is wholly *ex contractu,* i. e., it is not a status created by law. An agreement between the parties to create a joint venture is essential and whether or not a joint venture exists depends entirely upon the intention of the parties, either express or implied. As a general rule joint ventures are thought of in relation to a specific venture, a single undertaking, although the undertaking need not be one susceptible of immediate accomplishment. It is in the nature of a partnership limited to a particular venture, not general in operation or duration. It has been variously defined as an association to carry out a single business enterprise for profit; a common enterprise for mutual benefit; a combination of property, efforts, skill and judgment in a common undertaking. Joint control and management of the property and authority to act each for the other are usual characteristics along with the incurring of joint obligations and the enjoyment of joint rights. An agreement to share joint profits is essential to the creation of a joint venture. The profit accruing must be joint and not several; each must have an equitable interest in the profits themselves. But such an agreement in and of itself is

not determinative. The joint sharing of losses is also commonly regarded as essential. Bowmaster v. Carroll, supra; Chapman v. Dwyer, 2 Cir., 1930, 40 F.2d 468; Chisholm v. Gilmer, 4 Cir., 1936, 81 F.2d 120, affirmed 1936, 299 U.S. 99, 57 S.Ct. 65, 81 L.Ed. 63, rehearing denied 1936, 299 U.S. 623, 57 S.Ct. 229, 81 L.Ed. 458; First Mechanics Bank of Trenton v. Commissioner, 3 Cir., 1937, 91 F.2d 275; Tompkins v. Commissioner, 4 Cir., 1938, 97 F.2d 396; Detachable Bit Co. v. Timken Roller Bearing Co., 6 Cir., 1943, 133 F.2d 632; Eagle-Picher Co. v. Mid-Continent Lead & Zinc Co., 10 Cir., 1954, 209 F.2d 917; Potter v. Florida Motor Lines, D.C.S.D.Fla.1932, 57 F.2d 313; United States Fidelity & Guaranty Co. for Use of Reedy v. American Surety Co., D.C.M.D.Penn.1938, 25 F.Supp. 280.

■ The creation of a corporation to carry out the project alleged to be a joint venture further complicates the matter. It has been said that a joint venture could never exist when the parties expressly entered into a partnership or created a corporation. Ault & Wiborg Co. of Canada v. Carson Carbon Co., 1935, 181 La. 681, 160 So. 298; 33 C.J. 841. 48 C.J.S. Joint Adventures § 1. Other courts, however, have held that the interposition of a corporation does not automatically preclude a joint venture. Turtur v. Isserman, 1925, 2 N.J. Misc. 1084, 128 A. 151; Hathaway v. Porter Royalty Pool, 1941, 296 Mich. 90, 733, 295 N.W. 571, 299 N.W. 451, 138 A.L.R. 955, 967; Enos v. Picacho Gold Mining Co., 1943, 56 Cal.App.2d 765, 133 P.2d 663. The Hathaway case, supra, [296 Mich. 90, 295 N.W. 578] stated that "if it be the manifest intention of the parties to enter upon a joint venture, the employment of the corporate mechanism and the issuance of stock do not negative the existence of such relationship."

While we realize the danger in analogizing and relying on other cases in this area because of the necessity to decide each case on its own particular facts, nevertheless, there are several

cases, the facts of which are sufficiently similar to those in issue, that merit some detailed consideration.

In Enos v. Picacho Gold Mining Co., supra, an Ohio corporation possessed contracts for the purchase of certain golding mining properties. However, it lacked funds to actually acquire the property. It thereupon made a written agreement with a Canadian corporation pursuant to the terms of which a California corporation was organized. Ohio transferred the contracts to California for 49% of its stock and the Canadian corporation advanced the necessary funds to purchase and exploit the property in return for the remainder of the stock. The court said "a corporation may be but an instrumentality to carry out a joint adventure, and hence the mere fact that a corporation is interposed as an operating agent between two parties who hold its shares does not prevent them from being joint adventurers. But, on the other hand, that mere fact does not make them joint adventurers. The elements of joint adventure must be found in other matters. Here they do not so appear" (133 P.2d at page 667).

Bialostok v. A. & M. Knitting Mills, 1947, 272 App.Div. 936, 72 N.Y.S.2d 1, 2, concerned an agreement which "involved the formation of a corporation which was to employ, in the manufacture of sweaters, a device invented by the plaintiff, the equal distribution of the corporate stock, and a division between the parties of the corporate profits." The court held there was no joint venture since there was no agreement by the plaintiff to share in any losses.

In Hasday v. Barocas, supra, a partnership and another group, both of which were engaged in the manufacture of house dresses, purchased the controlling interest in a textile mill. All agreed that all the textiles produced by the mill would be sold to the parties in the same proportion as their stock interests. Thereafter the parties formed a partnership which was appointed the selling agent for the entire output of the textile mill. Profits were to be divided according to the stock interests in the corporation. Later another company was organized and that company agreed with the parties to purchase whatever it wished of the mill's output. Half of these purchases could be resold to anyone but the other half was reserved for the parties according to their stock interests. The court had the following to say "The ultimate inquiry is whether the parties have so joined their property, interests, skills and risks that for the purpose of the particular adventure their respective contributions have become as one and the commingled property and interests of the parties have thereby been made subject to each of the associates on the trust and inducement that each would act for their joint benefit * * * I find no amalgam of property or interests sufficient to create a joint venture. * * * There was no joint use of that produce contemplated, or any joinder of hopes of profit or risks of loss. *At most, the parties had interests in common which were to be furthered by certain mutual action. But it is this mutual course of conduct which the plaintiffs mistake for a joint venture. It is not enough that two parties have agreed together to act in concert to achieve some stated economic objective. Such agreement, by itself, creates no more than a contractual obligation, otherwise every stockholders' agreement would give rise to a joint venture.* [Emphasis supplied.] The fiduciary obligation arises upon the coagulation of property, profits or other interests which the parties can then be said to hold jointly and which are made accessible to each other in terms of the confidential relationship which exists between joint associates" (115 N.Y.S.2d at pages 215–216).

In Claude Neon Lights v. Federal Electric Co., 1929, 135 Misc. 113, 236 N.Y.S. 692; affirmed 1931, 232 App.Div. 786, 249 N.Y.S. 907, the plaintiff corporation held the patents and exclusive rights to manufacture and use a certain type of neon tube. Defendant corporation was engaged in the business of manufacturing and selling electrical products. The

two entered into an agreement providing for the organization of a new corporation to which the plaintiff would grant its exclusive rights and licenses for a specific territory and receive one-third of the stock in full payment. The court held that this did not constitute a joint venture. "The formation of the new company placed the [defendant] and plaintiff in the relationship of majority and minority stockholders, with the reciprocal rights and duties growing out of the relationship; but it did not constitute them joint adventurers. It is fundamental that, no matter how the shares of stock are held, the corporation itself is an entity wholly separate and distinct from the individuals who compose and control it" (236 N.Y.S. at page 696).

Applying the foregoing cases and legal principles to the facts in this lawsuit we hold there is insufficient cause to hold Socal and Texas as joint venturers. Checking over the list of common characteristics of joint ventures we find that there certainly was no express intent to enter into such a relationship, the enterprise conducted by Caltex could scarcely be considered limited in either operation or duration, neither Socal nor Texas had authority to bind the other, and there was no agreement to share losses. Nor was there any agreement to share joint profits. The profits anticipated were to be shared severally. Finally, we find that there was no sufficient commingling of property and interests. All Socal and Texas did, in effect, was to agree that it would be to their mutual advantage not to compete in certain markets. Texas relinquished its marketing superiority in return for Middle Eastern crude oil; Socal gave up some of its crude to acquire necessary marketing outlets. They agreed to cooperate in supplying certain areas with crude oil and refined products, but such an agreement falls far short of a joint venture. In this setting we feel that the creation of a corporation, Caltex, to carry out this purpose conclusively negates the idea of joint venture. This is not to say that

the interposition of a corporation automatically negatives joint venture. But it is an important consideration in that direction and will be conclusive in the absence of compelling factors to the contrary. Finally, there is one other consideration. What plaintiff seeks to accomplish by means of the joint venture is to impute to Caltex the knowledge of what Socal and Texas were doing in the Western Hemisphere—an area of operations in which the parents were highly competitive and clearly not joint venturers. There is no doubt that Socal and Texas were in complete ignorance of each others' Western Hemisphere operations, and that Caltex was in a similar position. We do not feel justified in stretching the concept of joint venture to cover this case in order to reach such an unfair result. Plaintiff attempts to impute knowledge of these Western Hemisphere operations when in fact no such knowledge existed and where there were compelling business reasons for secrecy.

In an attempt to show a joint venture, plaintiff relies on the following evidence. Mr. Rogers, Chairman of the Board of Texas used the words "joint company" in explaining the Caltex set-up before Congress. Mr. Follis, Chairman of the Board of Socal used the pronoun "we" at the same Congressional hearing when speaking of Mid-East and Oceanic ECA financed sales and employed the terms "partner" and "joint operation" when testifying at the trial concerning the 1936 agreement between Socal and Texas. In the absence of any showing that these terms were used in a technical legal sense (what evidence there is shows that they were used colloquially) we think they are not significant. The government was fully acquainted with the intercorporate relationships and the mere fact that certain government officials were unable to understand them affords no basis for liability. Indeed, it would be hazardous in the extreme to deal with the government if, after full disclosure, persons could still be held liable for official con-

fusion. Considerable reliance is placed upon a Socal interoffice memorandum [8] concerning the Shell exchange (about which more later). This supposedly is an indication of some "consciousness of guilt," but that inference is difficult to draw since Socal never followed the suggestion to engage in a three-way exchange to overcome possible ECA objections.

Great stress is placed upon a letter from Caltex to ECA which stated that the Canadian, Bahama and United Kingdom Exchange Control authorities considered Bahrein and Caltex to be American companies even though incorporated in Canada and the Bahamas, principally because of American ownership and control. The letter also contained the further statement that "the ultimate management and responsibility for operations of our foreign companies rests with American stockholders, our general management and control is in the hands of Americans and our general policies are oriented primarily toward American general policy." To like effect is a statement made in a conference between Caltex and ECA that "the stockholders can control Oceanic." There is nothing particularly surprising in either of these exhibits. The stockholders always control the corporation and are always ultimately responsible for its management and operation. This is merely a truism. Nor is there anything particularly sinister in the fact that Caltex's parents and their attorneys were working on the problems raised by ECA's contention that the price of crude oil should not exceed $1.43. Both Socal and Texas had sizable investments in Caltex to protect and a certain amount of legitimate interest in, and concern for, their subsidiary is only normal and natural. United States v. Elgin, Joliet & Eastern Railway Co., 1936, 298 U.S. 492, 56 S.Ct. 841, 80 L.Ed. 1300.

Plaintiff makes much of the fact that Oceanic, which signed the offtake agreements with Aramco, Socony and Jersey, permitted Socal and Texas, from time to time, to take Aramco crude directly, and constituted Mid-East an assignee offtaker, all without the written consent of Jersey or Socony. This argument is predicated upon a clause in the offtake agreements to the effect that the "agreement and the rights arising hereunder shall not be assignable without the approval in writing of the other parties hereto except to a corporation, the stock of which is owned 100% by one or more of the parties hereto." Defendants, however, point to other language—the "Buyer agrees to receive the [crude oil] *or cause the same to be received* from the Seller in accordance with quarterly schedules to be mutually agreed upon * * *." The former clause would seem to envision assignment of the contract as a whole, but there is no need to involve ourselves in complicated problems of construction. Suffice it to say that the mere fact Socony or Jersey may have condoned loose practice is no reason to hold Socal and Texas as joint venturers.

Finally, there remains the question of whether or no, joint venture aside, the corporate entities may be disregarded. It is "well settled that a corporation is ordinarily an entity, separate and apart from its stockholders, and mere ownership of all the stock of one corporation by another, and the identity of officers of one with officers of another, are not alone sufficient to create identity of corporate interest between the two companies or to create the relation of principal and agent or to create a representative or fiduciary relationship between the two. If such stock ownership and potential control be resorted to only for the purpose of normally participating in the affairs of the subsidiary corporation in a manner usual to stockholders and not for the purpose of taking some unfair advantage of the subsidiary or using it as a mere adjunct to the main corporation or as a subterfuge to justify wrongdoing, their identity as separate

---

8. This says in part "Possible objections to foregoing may be ECA claim Socal in effect selling Arabian crude for $1.40/bbl.

* * * Preferable arrangement appears to be three way exchange whereby we obtain Mid-Continent or Gulf Coast crude."

corporations will not be disregarded but their respective rights when dealing with each other in respect to their separate property will be recognized and maintained. The extent of stock ownership and mere potential control of one company over another has never been regarded as the determining factor in the consideration of such cases. Something must be disclosed to indicate the exercise of undue domination or influence resulting in an infringement upon the rights of the subservient corporation for the benefit of the dominant one. Otherwise the rights of the separate corporations in respect to their corporate property must be governed by the rules applicable in ordinary cases." Kentucky Electric Power Co. v. Norton Coal Mining Co., 6 Cir., 1938, 93 F.2d 923, 926. See also: Pullman's Palace-Car Co. v. Missouri Pacific Railway Co., 1885, 115 U.S. 587, 6 S.Ct. 194, 29 L.Ed. 499; Pierce v. National Bank of Commerce, 8 Cir., 1926, 13 F.2d 40; Kingston Dry Dock Co. v. Lake Champlain Transp. Co., 2 Cir., 1929, 31 F.2d 265; United States v. Aluminum Co. of America, 2 Cir., 1945, 148 F.2d 416; United States v. Brown & Sharpe Manufacturing Co., D.C.D.R.I. 1956, 141 F.Supp. 520; Baim & Blank v. Philco Corporation, D.C.E.D.N.Y.1957, 148 F.Supp. 541; Berkey v. Third Avenue Railway Co., 1926, 244 N.Y. 84, 155 N.E. 58, 50 A.L.R. 599.

Plaintiff has neither alleged nor proved any facts which would require piercing the corporate veil. Bahrein, Caltex, Oceanic and Mid-East were organized for legitimate business purposes, they operated autonomously, and the government was fully informed of the intercorporate relationships. Plaintiff urges some sort of estoppel but there are no grounds for this. Indeed, if any estoppel exists it should be the other way around. A letter from ECA discussing Middle Eastern crude oil prices was not sent to Socal because "its only overseas sales interest appears to be through its ownership of one-half of the stock of 'Cal-Tex' * * *". Just why the same letter was sent to Texas is not clear, but in any event ECA's only communication with Texas thereafter was a request for information about certain shipments and a copy of the claim letter to Caltex from the Department of Justice.

It is also interesting to note that ECA considered the following amendment to the Regulations in 1951: "Where the export sale is made by a subsidiary corporation and a majority of the stock ownership is held by one company, the subsidiary shall be considered as an agent exporting on behalf of its majority owner; and the export shall be considered as made by the majority owner". No action, however, was ever taken on this proposal.

But most important of all, there are no allegations of fraud. Those allegations of misrepresentation appearing in the First and First Amended Complaint were expressly repudiated by present government counsel when he sought leave to file the Second Amended Complaint. A careful study of the record indicates a complete absence of fraud in this case. Mr. Hoffman, the Administrator of ECA, testified on cross-examination "I never felt there was any fraud or deceit at all". In view of this we adopt as our own the language appearing in W. E. Hedger Transp. Corporation v. Ira S. Bushey & Sons, 1945, 186 Misc. 758, 61 N.Y.S.2d 876, 880, affirmed 1946, 270 App.Div. 912, 61 N.Y.S.2d 882, also a case of an alleged joint venture. "[U]pon the facts alleged the corporate entity of none of the corporations may be disregarded. Plaintiffs do not plead or assert that such entities were created or used as a subterfuge in order to mislead or defraud them. In fact, the contrary appears; and plaintiffs in their brief expressly disclaim any charge of fraud. It has become well settled that the open and deliberate use by individuals of the corporate medium for the transaction of business will subject to liability only the corporation and will give rise to rights which may be enforced only by the corporation; and that this legal result ensues even when the corporation is dominated by one individual who holds all of its stock. [Ci-

tations omitted.] At times, perhaps, the 'corporate veil' may be pierced and the corporate entity disregarded; but only when they have been used as a cloak and a cover and as a means for the commission of a palpable fraud. [Citations omitted.] But, as stated, no such use has been asserted and plaintiffs in their briefs disavow any claim of fraud. Indeed, in view of the allegations of the complaint no such use could be established" (61 N.Y.S.2d at pages 880–881).

Plaintiff must fail in its attempt to treat all defendants as one.

### Comparable Sales Test

This alone is sufficient to require dismissal of the entire lawsuit as against all but Oceanic and Mid-East, and to require as to the latter a dismissal of so much of the cause of action as is based on the comparable sales theory. However, rather than leave the matter at that we prefer to discuss the merits in some detail because we are convinced plaintiff could not succeed on that ground in any event.

Indeed, plaintiff also concedes this theory is rather weak. In his opening counsel said "If I were trying this lawsuit on comparable sales test alone, I might be subject to a motion to dismiss at the conclusion of my case". And a little later he remarked "I frankly think the Government's case should be presented and properly is presented on the special rule approach".

The comparable sales test is set forth in § 201.22(e) (2) of Regulation 1. "A price for a purchase outside the United States of a commodity * * * will be approved for reimbursement if (i) It does not exceed any price charged by the supplier at the time of purchase in a comparable export sale of the same or a similar commodity; and (ii) It does not exceed the export market price prevailing at the time of purchase in comparable sales of the same or a similar commodity by the 'principal suppliers' in the source country * * * and (iii) It results in a delivered cost to the port

of entry in the participating country no higher than the delivered cost which would have been incurred in a purchase for export of the same or a similar commodity from one of the 'principal suppliers' in the United States." A comparable sale is defined in § 201.22(b) 2. "The term 'comparable sale' includes all sales which are comparable as to quantity, quality, grade, period of delivery, supply area, terms of sale and class of customer. If special market conditions exist in a country other than the United States, a sale for export to such country shall not necessarily be deemed comparable to a sale for export to any other country."

The government has no claim with respect to § 201.22(e) (2) (iii). Violation of this section of the Regulation, the "statutory test," was alleged in Count II of the First Amended Complaint. In his Memorandum in support of the Motion for Leave to File Second Amended Complaint counsel pointed out that this count had been eliminated from the Second Amended Complaint because "plaintiff admits [it] is not a tenable or provable cause of action."

Nor can any claim be based upon § 201.22(e) (2) (ii). There is no evidence in the record of a lower prevailing export market price in the source country. There is no indication that any company other than defendants, offered to sell crude oil f. o. b. Ras Tanura or Sidon for less than $1.75 or $2.41 respectively. So far as defendants are concerned, we will assume for the purposes of argument that some Socal and Texas Western Hemisphere transactions took place at lower prices. The mere fact that some sales (if indeed, they were sales) took place at less than $1.75 does not automatically lower the prevailing export market price. As ECA has said "small movements to destinations outside the major marketing areas of the supplier do not in general determine the prevailing market price at the source. * * * Movements * * * ranging from 1.9 percent * * * to 13.0 percent * , * * and

averaging 10.6 percent of total supplies, * * * are not substantial and are properly characterized as marginal movements. A different case would be presented if such movements were of the order of one-third or more of total sales." The transactions involved here are not of that magnitude. They were, at most, sales below market for special reasons.

The government at one time alleged that the Aramco offtake price was a market price and constituted a comparable sale. This was repudiated at the time of filing the Second Amended Complaint when present counsel, on oral argument of the motion, stated, "I feel that the price, the Aramco offtake price of $1.43, is where everyone went down the wrong road * * * that is not the basis or the thrust of the complaint as I prepared it now." The uncontroverted evidence is to the effect that the $1.43 offtake figure was substantially below the market price and was a figure agreed upon by Socal, Texas, Jersey and Socony, the Aramco owners, which would be high enough to enable Aramco to carry on its development yet low enough to give the owners a competitive advantage.

Plaintiff near the end of the trial introduced evidence of some sales of Kuwait crude to Socony by Anglo-Iranian for $1.46 but these are irrelevant for a number of reasons. The source country is different; the terms of the contract, calling for *inter alia* a substantial investment in Anglo-Iranian, were most unusual; and the price was confidential. We have great difficulty in translating a secret and highly confidential price into a prevailing export price.

A question was also raised regarding the New Caltex Oil Plan. This was an arrangement negotiated between Caltex and the United Kingdom primarily to ease the dollar shortage. In effect it called for the creation of Caltex U. K., a British corporation owned 50-50 by Texas and Socal, which would obtain crude oil from Bahrein for sterling and from Aramco for dollars and sterling. This oil was then refined at Bahrein and Caltex U. K. sold products only to former customers of Oceanic in the sterling area. Caltex U. K. acquired its oil from Aramco at $1.43 and this is alleged to be a comparable sale. But the evidence seems to be clear that Caltex U. K. was an offtaker and not a purchaser of crude. The fact that the Plan refers to Caltex U. K. as a buyer of Aramco crude is not persuasive since the offtake agreements themselves speak in terms of buyer and seller, and since the Plan also refers to Oceanic as a buyer although it is undisputed that Oceanic was an offtaker. This is the first time ECA ever questioned that Caltex U. K. was an offtaker although it has been fully informed of the Plan since its inception. Furthermore, after negotiations with the Saudi Arabian Government resulted in a retroactive increase in royalty payments, Caltex U. K. paid its share as did the other offtakers. Finally, the circumstances surrounding the creation and operation of Caltex U. K. were so different from the ordinary operation of Caltex, Oceanic and Mid-East that none of the Caltex U. K. transactions could be deemed comparable.

Not only is there no evidence of a lower prevailing export price, but there is also no evidence identifying the "principal suppliers" or specifying the volume of their sales. A principal supplier is defined as "one of the group of the largest volume suppliers responsible for 50 percent of the export sales of the commodity from * * * the source country * * *." There is a complete lack of proof on this issue.

With respect to § 201.22(e) (2) (i) it is undisputed that Oceanic and Mid-East never sold crude oil for less than $1.75 f. o. b. Ras Tanura or $2.41 f. o. b. Sidon.

However, we will assume for the sake of argument that all defendants may be treated as one, and that Mid-East and Oceanic are chargeable with knowledge of their parents' Western Hemisphere operations. These operations may be divided into four separate categories:

(1) intracompany transactions (2) exchanges (3) the Texas-British American sale, and (4) the Texas-McColl Frontenac sale. We shall discuss these seriatim.

*Intracompany transactions*: With respect to Texas, during the period of this lawsuit it lifted 57 shipments of crude directly from Aramco as an assignee offtaker and shipped it to its Eagle Point refinery in New Jersey. Socal, through Calmara and later Cal Transport, both assignee offtakers of Oceanic, shipped Aramco crude to the United States either to its own account or to the account of California Oil and California Refining, both wholly owned domestic subsidiaries. Calmara and Cal Transport were also wholly owned subsidiaries of Socal. Calmara was a domestic corporation and Cal Transport was Liberian. Shipments from Calmara to Socal were on the basis of $1.70 f. o. b. Sidon (price paid Aramco plus 2¢); Calmara to California Oil $2.63, $2.73 and $2.75 c. i. f. Marcus Hook, Pennsylvania; Calmara to California Refining varied from $2.63 to $4.94 c. i. f. Sidon.[9] Cal Transport shipments to Socal were on the basis of $1.67 and $1.70 f. o. b. Sidon and $1.45 f. o. b. Ras Tanura (price paid Aramco plus 2¢); to California Oil $3.47 c & f Barber, New Jersey, less U. S. duty of 21¢, resulting price $3.26; to California Refining $3.49 or $3.47 c & f Barber, New Jersey less U. S. duty of 10½¢ or 21¢ resulting in prices of $3.38, $3.36 and $3.26. (During this same period Socal also made other shipments to the Western Hemisphere. These were commercial sales to YPF Argentina and ANCAP Uruguay at either $1.75 f. o. b. Ras Tanura or $2.41 f. o. b. Sidon—the same prices at which ECA was financing.)

With respect to Cal Transport plaintiff argues that since it was a Liberian corporation, § 45 of the Internal Revenue Code of 1939, 26 U.S.C.A. § 45, required arm's length dealing between a domestic corporation and its foreign subsidiary and required that sales and purchases be made at current market prices. That simply is not so. Section 45 merely authorizes the Commissioner in his discretion to reallocate costs and profits between related organizations to prevent evasion or to clearly reflect income.

We do not think any of these transactions can be considered comparable sales. In fact, they are not even sales. They are merely steps in one integrated operation aptly described as "Arabia to the pump in Portland." "Prices" charged on these transactions were based on internal considerations and did not reflect market in any sense. This was made explicit by Caltex in a conference with ECA in 1951, as follows:

"Well, the process by which our parents transfer and handle the transfers of crude oil into the United States is a process that is related to a very closely integrated operation, in which the parent company and its individual operating companies treat the various parts of the whole transaction as a unit from an operating standpoint.

"In Cal-Tex's case, if you are speaking of our shipments to Europe, the companies involved have a more individual character because of varying nationalities, varying degrees of minority interest, and things like that. You have two differences that I think are basic in this.

"One difference is that although our local refining and marketing companies are owned by one of our group, each deals entirely with refining and marketing operations in a different country. The member of our group supplying it with crude or products has its source in still a different country and it sells to the local companies at a competitive price because of the market conditions which exist in the locality, the actual position of the local company in the market and the circumstances in which it operates in the market. This is completely different from the type of transaction in which the parent crude refining company

---

9. This curious arrangement was described, off the record, as a sale f. o. b. Sidon which included insurance and freight.

in the United States functions as just a link in a single chain of coordinated operations. Our companies operate much more independently.

"For instance, the prices at which petroleum is transferred to our parents' refining companies in the United States is rather completely integrated into one chain in which only the final market—the sale of gasoline in Portland or somewhere like that—is a market factor. And therefore they can make those transactions between their own companies on any basis they want.

"In our case, however, the marketing companies and the refining companies cannot be integrated so directly into our parents' or our operations in the first place, and in the second place they are compelled by import regulations, things like that, to deal with the market price. We are compelled because of minority interests, various tax interests, etc., to deal with market price rather than having this freedom of making our intra-company transactions on any basis that might suit our corporate convenience.

"So, you have a completely different type of operation than you have in this sort of closely integrated unit that you have in the United States.

\* \* \* \* \* \*

"Only two items really interest the parents in their operation. One is the cost of producing and refining oil, and the other is what they can sell it for, and anything in between belongs to them, and they can move it around any way they want to. That just isn't true within the Cal-Tex group."

ECA recognized the merit of at least some of these contentions, for it admitted "two valid distinctions were made between transactions to the two areas. First, that Caltex's parents had a right to receive Arabian crude at $1.43 by virtue of their investment in Aramco. Secondly, that prices on shipments to Europe are governed by foreign currency exchange controls in contrast to the freedom of import prices in Western Hemisphere countries." We agree with the statements ECA made to Congress on this matter. Mr. Anderson, Director of the Industry Division, testified concerning "certain shipments of Middle East oil on the part of an American oil company, which are sold in the United States.—which is not a true sale \* \* \*." When questioned as to why it was not a true sale, and why payments were made, he replied, "Because there is no change of title. \* \* \* [Payments are made] for a variety of reasons. There is, of course, the necessity of keeping two sets of books: one for the company organized outside the United States, and one for the company organized inside the United States. Then, there is the question of taxes, and where the profit is shown and not shown. \* \* \*" Mr. Hoffman stated that "Most of the oil comes into the refineries of the companies who own the producing wells in the Near East, producing companies, and, of course, one of their claims is that it is a mere intercompany [sic] transaction. Their prices are for their company purchases, and company purposes and have no relationship to the markets, and I think there is considerable substance to that."

Finally, it is significant that ECA considered, but never adopted an amendment to the regulations making comparable "sales which differ only with respect to the corporate affiliation between exporter and purchaser." We hold that none of these transactions were sales, nor were they comparable.

*Exchanges:* Socal entered into a transaction with Shell. At the time of the Korean crisis Socal experienced an acute shortage of crude in California. Fortuitously an agreement was concluded with Shell whereby Socal gave Shell crude at Sidon and in return received crude from Shell at Borneo. This type of transaction is common in the industry and is nothing more than a barrel for barrel exchange. It has been variously defined as "an old-fashioned swap" and "a device whereby we shift our inventory." Its chief merit lies in the fact that it enables both parties to reduce

freight costs. As a result of this transaction Socal saved 4,000 miles of transportation by picking the oil up at Borneo rather than Ras Tanura. This was especially significant since freight costs had risen sharply. The oil was originally billed on the basis of $2.37 a barrel but this was later retroactively changed to $1.70. No explanation of the $2.37 was given other than that Shell wanted it, but Socal said it generally regarded the cost of the commodity received as equal to the cost of the article it gave up. At the time of this transaction Socal had a commitment to supply Imperial of Canada with California crude. An agreement was worked out with Imperial whereby the latter accepted delivery of the Borneo crude. This made possible a further reduction in freight costs and saved some United States import duties. It might also be noted that during this same period Socal was selling crude to Shell for $2.41 f. o. b. Sidon and $1.75 f. o. b. Ras Tanura.

Texas entered into exchange agreements with three companies: Atlantic Refining, McColl-Frontenac and Socony. Plaintiff has now abandoned the last transaction. These were similar in theory to the above described Socal-Shell exchange. We do not think any of these transactions constituted sales. They were simply convenient methods for transferring inventories from less advantageous to more desirable locations at a saving in freight costs. Each company's net cash and crude stock position was the same after as before the transactions.

Plaintiff contends that certain entries contained on customs documents received in evidence constitute admissions against interest. It is admitted that the duty imposed on crude oil is a specific amount per gallon, and not an *ad valorem* duty. I.R.C.1939 secs. 3420, 3422, 53 Stat. 414, 26 U.S.C.A. §§ 3420, 3422. However, great stress is placed upon the dollar amounts stated in certain consular and commercial invoices, and the consumption entries. With respect to the invoices, sec. 481 of the Tariff Act of 1930 (19 U.S.C.A. § 1481, 46 Stat. 719) merely requires a statement of the "purchase price of each item in the currency of the purchase." This is precisely what is stated on the invoices—the offtake price which Texas paid Aramco. In addition, the consular invoice contains the legend "such or similar merchandise is not freely offered for sale to all purchasers for home consumption or for export to the United States." Two of the commercial invoices contain similar qualifications— "the above price is determined pursuant to an offtake arrangement * * * the total does not necessarily represent the commercial value at the point of shipment." A third commercial invoice contains no such legend. None of the consumption entries contain such statements, and whether their accompanying invoices contain any, we do not know since they were not offered in evidence. With respect to the Socal transactions, there is evidence that at least some of their invoices bore the stamp "Note: This invoice represents a transaction between affiliated companies, not a commercial transaction." The Consumption Entries under the heading "Entered Value in U. S. Dollars" contain figures, which if divided by the number of barrels, approximate the offtake price. In the only exhibit for which we have both invoice and consumption entry, the figures are the same on each. Plaintiff argues that § 402 of the Tariff Act, 19 U.S.C.A. § 1402, defines value to mean market price and that this meaning carries over to the consumption entry. The consumption entry form is specified in the Regulations (19 CFR 8.27), but these are silent with respect to the meaning of the terms used in the form or the manner of filling it out. However, Regulation 8.27 is based upon § 484 of the Tariff Act, 19 U.S.C.A. § 1484. This says in part "the consignee of imported merchandise shall make entry therefor" and that "Such entry * * * shall set forth such facts in regard to the importation as the Secretary of the Treasury may require for the purpose of assessing duties and to secure a proper examination, inspection, appraisement and liquidation * * *."

Now since no appraisement in terms of market value is necessary for the imposition of duties on crude oil, we fail to see how the statute or regulations require defendants to state market value. Furthermore, the evidence indicates that defendants thought the word "value" to have no outside meaning, and that they put down whatever figure best suited their internal purposes. Whether they were right or wrong in doing this, their actions do not rise to the dignity of admissions against interest, much less do they establish a market price.

*British-American and McColl-Frontenac Sales*: Texas entered into two sales contracts with McColl-Frontenac during the period of this lawsuit. The first, signed October 31, 1950, called for the shipment of 7,000,000 barrels plus or minus 10% of Arabian crude during 1951. The prices were $2.75 c. i. f. Montreal and $2.70 c. i. f. Portland, Maine, later reduced to $2.67. The second, signed September 9, 1951, covered the year 1952 and called for 7,500,000 barrels. Prices were increased to $2.85 and $2.80 respectively.

With respect to British-American, Texas delivered Arabian crude to it in 1950 pursuant to the terms of a contract signed October 4, 1949 calling for shipments of 2,000,000 barrels at $2.65 c. i. f. Montreal and $2.60 c. i. f. Portland. On September 5, 1950 Texas and British-American verbally agreed to a similar contract, which was signed September 27, 1950, to cover shipments of 2,000,000 to 2,500,000 barrels during 1951. Prices were raised to $2.75 and $2.70 respectively.

There are a number of difficulties in treating these sales as comparable. In the first place, the terms of sale (Reg. sec. 201.22(b) (2)) are different. Plaintiff asks us to compare a c. i. f. with an f. o. b. price. We agree with defendants that it is an over-simplification to deduct the freight component (assuming this could be determined for each shipment) from the c. i. f. price. Other intangibles must be taken into account. Such a calculation, when adjusted for these intangibles yields a net back and not a price. Defendants have made frequent use of net backs, and that is one of the complicating factors in this lawsuit. But a net back is primarily an analytical device and we do not find that the use of $1.43 cost factor in a net back calculation establishes a f. o. b. price. The use made of the $1.43 figure has been adequately explained. Texas estimated the laid down price which it thought would be competitively attractive and placed it on one side of an equation. It then placed its cost factor of $1.43 on the other side, and inquired of its marine department the cost of hauling the oil. This figure was inserted in the equation and any resulting plus or minus figure represented the company's profit or loss on the transaction. In this fashion Texas analyzed its position and determined whether or not it could make an attractive offer.

However, with respect to the first McColl-Frontenac contract such problems of comparison do not exist. That price was quite explicitly stated. "It was, of course, brought out that the price at Sidon would be the board price of $1.43 per barrel, plus 55¢ differential through tapline for a total of $1.98 per barrel." This, by the way, was the same price at which Texas had been selling to McColl before the period covered by this action—i. e., $1.43 f. o. b. Ras Tanura. Plaintiff suggests some sinister purpose for the change from an f. o. b. to a c. i. f. basis after the special waiver had been withdrawn in August 1950. This special waiver granted to Caltex and two others stated that sales to a customer in one country would not be considered similar to sales to a customer in another country. It applied to both crude and products, but its issuance and revocation both seem to have been prompted by the products situation. Here again, we find that Texas has rebutted the inference by explaining that it did not feel McColl, a majority owned subsidiary, was financially able to assume the vastly greater risks of the tanker market involved in increased imports from the Persian Gulf. Because of

the distances involved, the fluctuations and risks connected with importing from Venezuela are considerably less.

But even if it could be determined that all of the aforementioned shipments were priced on the basis of $1.43 f. o. b. Ras Tanura, we find that they were not comparable for other reasons. Revocation of the special waiver just withdrew the blanket policy that sales to different countries were not comparable. But § 201.22(b) (2) still remains, and we are satisfied that Texas has established special market conditions which differentiate these sales from those made by Oceanic and Mid-East. The unrebutted evidence indicates that at the time the British-American and McColl-Frontenac contracts were negotiated in 1950 (the negotiation of the first British-American contract was considerably before the period of this lawsuit) Texas, despite the Korean crisis which it expected would end shortly, had an excess of tanker avails which it was most anxious to utilize to avoid the large losses entailed in laying the tankers up. The additional fact that tapline was scheduled to come on stream in December 1950 only aggravated the situation. A further factor was the very considerable pressure being brought to bear on the Aramco owners by the Saudi Arabian government to lift their maximum share of oil so as to increase royalties.

With respect to McColl-Frontenac, Texas which held a controlling interest, felt a moral if not a legal obligation to supply it at attractive prices, especially after the shutdown of the Toronto refinery. Since it had been supplying McColl for some time at $1.43 these factors would have made it difficult indeed to increase the price above $1.43 after the special waiver was withdrawn. An additional complication was the problem concerning the proper disposition of McColl's excess tankers in view of its working agreement with Texas, and its desire to take advantage of low charter rates which it thought it could obtain.

In connection with British-American, Texas was not only looking for an addi-

tional Canadian outlet, but was hopeful some arrangements could be made for joint refining facilities in Western Canada which it was most anxious to acquire. Furthermore, the 1950 as well as the 1949 contract included a "most favored nation" clause which obligated Texas to sell British-American at a price at least as attractive as that offered to its subsidiary McColl-Frontenac. Finally, there appears to have been an unusually aggressive competitive situation, replete with exchange premium problems. Whether spirited competition in itself is sufficient to create special market conditions is doubtful, but the freight advantages inherent in Venezuelan oil certainly introduced a factor missing in the European picture. Taking all these considerations as a whole, we find that special market conditions did exist which would warrant distinguishing these sales from the Mid-East and Oceanic sales. (Parenthetically it might be noted that from July 11, 1951 until April 22, 1952 Texas was selling Arabian crude to Shell at $2.41 f. o. b. Sidon for delivery either to the United Kingdom or purchaser's vessel.)

Consequently, we find that none of these transactions constitute comparable sales even if it be assumed that all defendants may be treated as one and that all shipments were based on the price of $1.43 f. o. b. Ras Tanura.

### Tapline

All of plaintiff's various theories and claims apply equally to the tapline "charge" added to the price f. o. b. Sidon. In other words it is alleged that not only was the price of the oil excessive, but so also was the amount charged for the tapline service.

Strictly speaking, there was no such thing as a 66¢ tapline charge, although there was a 66¢ difference in the price of crude oil at Ras Tanura and Sidon. Tapline costs amounting to 20¢ or 25¢ a barrel were charged the offtakers and billed directly by Aramco which acted as a collecting agency for Tapline. The 66¢ differential was established to equalize the

price of Persian Gulf and Eastern Mediterranean crude. There is some dispute as to how the sum of 66¢ was determined, but it seems that it was based either on the freight cost of hauling a barrel of oil around the Arabian Peninsula from Ras Tanura to Sidon or the difference between hauling it from Ras Tanura to Rotterdam and Sidon to Rotterdam. The freight rate used is also disputed, but it would appear to be USMC flat.

But none of this is really material. On March 23, 1951, a few months after tapline came on stream ECA wrote Caltex saying "the price f. o. b. Sidon which is no higher than the eligible price f. o. b. Ras Tanura plus 66¢ per barrel is eligible for ECA financing, providing all other requirements in ECA Regulation No. 1 are satisfied." ECA never financed a tapline "charge" in excess of 66¢. In the light of what has already been said respecting plaintiff's various theories, the only applicable price provisions in ECA Regulation 1 were the comparable sales provisions and none of the transactions complained of in which a lesser charge was made were in fact comparable sales. Consequently, there can be no recovery on this ground.

### The Supplier's Certificate

Turning finally to the Supplier's Certificate we find, on the basis of the facts disclosed and discussed above, that it affords no basis for this lawsuit. By the terms of this document, required to be signed by each supplier—Oceanic and Mid-East in this case, the supplier "certifies and agrees with the Administrator as follows:

"(1) The supplier is entitled under said contract to the payment of the claimed sum, and he will promptly make appropriate reimbursement to the Administrator * * * for any breach by him of the terms of this certificate.

"(7) The supplier further certifies, on the basis of information obtained from such sources as are available to him, that to the best of his information and belief the purchase price is no higher than the market price * * * prevailing in the United States at the time of purchase, adjusted for differences in the cost of transportation to destination. * * *

"(8) The supplier further certifies that (a) on the basis of information obtained from such sources as are available to him, and to the best of his information and belief, the purchase price is no higher than the price calculated in accordance with the applicable price provisions of ECA Regulation 1, as amended, and he has complied with the rules provided therein; * * *."

It is conceded that there is no violation of paragraph 7, and in view of the findings and conclusions stated in this opinion, there was no violation of paragraph 8 inasmuch as the only price provisions or rules contained in the statute or regulations with which defendants were bound to comply were those relating to comparable sales, and none of the transactions complained of were comparable sales.

The use of the phrases "on the basis of information obtained from such sources as are available to him" and "to the best of his information and belief" in paragraph 8 gives clear indication that a violation of the price provisions or rules, does not automatically amount to a breach of the terms of the certificate. Absent such a breach there is absolutely no authority for a suit against the supplier based on such certificate. Something more than a bare violation is necessary to give rise to liability.

This was one of the first problems that ECA considered. In a letter dated July 21, 1948 the Acting Administrator requested a ruling from the Comptroller General "that compliance with this procedure ["a certificate from the supplier, on information and belief, to the effect that the price charged was within the prevailing market price in the U. S."] would relieve * * * suppliers who have acted in good faith in compliance with the regulation and have been paid

either by ECA or by a bank * * * from any liability for a violation of section 202". The Acting Comptroller General replied that "if the proposed certificate be modified accordingly, [suggesting language almost identical to present paragraph seven of the certificate] this office will accept the same as sufficient to relieve suppliers * * * from liability from violations of section 202 of the act in absence of fraud or bad faith otherwise on their part". (Parenthetically, it should be noted that the reason these communications speak only in terms of the statutory test is that the comparable sales provisions had not yet been written into the Regulations.) On the strength of this understanding ECA's Assistant General Counsel, in reply to a question by an exporter, stated "As to a supplier's liability under the certificate; each country receiving ECA assistance has agreed that if any transaction is disallowed by ECA, the country will itself reimburse us. In general, and unless the Supplier's Certificate appears to be deliberately or recklessly false, it is our intention to obtain reimbursement from the country involved rather than from the supplier". Administrator Hoffman confirmed this policy. And we find it to be a very reasonable interpretation of the language found in the Certificate.

In this case there is no question of fraud or bad faith, nor for that matter of reckless falsity. But just so the record may be absolutely clear we will consider the Supplier's Certificate in connection with the Government's various theories.

Even assuming that we had found in favor of the Government's contention that the so-called formula was written into the Regulations and that it applied to the facts in this case, we do not find defendants guilty of any recklessness in signing the Certificate. Their information and belief must be tested as of the time of the signing and not with the benefit of hindsight. The Government's theory was not announced until the Second Amended Complaint was filed, some four to six years after the events took place,

and the validity of such a theory could only have been determined after a lengthy and complicated trial. The mere fact that the Government might have been ultimately vindicated in 1957 does not make its position so clear in 1950–1952 that defendants' action in signing the Certificate amounted to reckless falsity.

The same is true with respect to comparable sales. We do not think Oceanic or Mid-East had sufficient cause to anticipate that the Government would hold them responsible for their parents' Western Hemisphere transactions. Furthermore, the fact that all the defendants might be deemed joint venturers for the purpose of the comparable sales theory does not necessarily mean that the same result should obtain with respect to the Supplier's Certificate. The language therein plainly refers to information from "such sources as *are* available to him," and it is perfectly clear that the information was, in fact, not available to either Oceanic or Mid-East. When liability provisions speak in terms of knowing or willful violations, the defendants must have actual knowledge.

Consequently, even if the plaintiff were to succeed on all of its theories we find, that at the time the Certificates were signed, these theories were so nebulous and inadequately brought home to defendants that they acted in complete good faith and are therefore relieved of all liability even though the certificates might have been false.

### Miscellany

There are several miscellaneous matters which require our attention. Defendants moved to dismiss at the end of plaintiff's case and decision was reserved. That motion is now denied since we have preferred to base our opinion on all the evidence presented. However, from what has already been said it must be clear that we were inclined to grant the motion—with respect to the lowest competitive market price theory because plaintiff failed to persuade us that there was any statute, regulation, rule or agreement to support it; with respect to the

**162**

comparable sales theory because defendants are not joint venturers; and thirdly because there was no fraud, deceit, or recklessness on the part of any defendant which would warrant a suit based upon the Supplier's Certificate.

Several exhibits have been marked for identification only and decision reserved as to their receipt in evidence. We do not think any of them should be properly received, but to accord the plaintiff every benefit of the doubt we have considered and received all of its exhibits so marked and excluded all of defendants'.

Finally, many of plaintiff's exhibits were received subject to connection. Plaintiff offered each exhibit against all defendants even though some had no knowledge of them. In view of our conclusion that defendants are not joint venturers, the offer of each exhibit must be limited. However, in deciding the case we have considered each exhibit as binding on all defendants.

Conclusion

We realize that this opinion has been unduly prolix. It could be lengthier if we included reference to more of the testimony, particularly the exhibits. Suffice it to say that the proof offered by the defendants has only been highlighted. A great deal more was received in evidence about which no reference has been made since it seemed redundant. We cannot conclude, however, without saying and finding as a fact that the defendants' proof showed beyond contradiction that the prices financed by ECA were in fact the lowest competitive market prices. Throughout the entire period ECA continued to finance at such prices, which perhaps more than anything else indicates ECA's acknowledgment that the prices charged were in fact the lowest competitive market prices.

Accordingly, the complaint is dismissed and the defendants are entitled to judgment on the merits.

This opinion is filed in lieu of Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Rules of Civil Procedure, 28 U.S.C.A.